Recc. pd. #9665098

FILED
JUN 30 2006
U.S. COURT OF FEDERAL CLAIMS

ORIGINAL

ECF

# UNITED STATES COURT OF FEDERAL CLAIMS

**NORTH HARTLAND, L.L.C.,**
**PLAINTIFF** :

:

**V.** :

06-495 C

**UNITED STATES OF AMERICA**
**(RURAL UTILITIES SERVICE OF**
**U.S. DEPARTMENT OF AGRICULTURE),** :
**DEFENDANT**

## COMPLAINT
**(Compensatory Damages Action for Breach of Contract; Alternative Count for Fraudulent Entry Into Contract Without Intent to Perform)**

Now comes the plaintiff North Hartland, L.L.C., by counsel, which pleads on personal knowledge as to itself, and upon information and belief as to other matters, as follows:

1. Plaintiff North Hartland, L.L.C. ("North Hartland") is a limited liability company organized under the laws of Virginia. Plaintiff North Hartland is the valid assignee, transferee of and successor to, Contech Development Company, L.L.C., a New Hampshire limited liability company. Further reference to this plaintiff is as "Hartland-Contech." This action is authorized by North Hartland, L.L.C.

2. Defendant United States of America is sued with respect to express

contract breach and misconduct by the Rural Utilities Services of the U.S. Department of Agriculture.

## Jurisdiction Pursuant to Tucker Act

3. Jurisdiction of this Court is conferred by the Tucker Act, 28 U.S.C. §1491(a)(1), because of the government defendant's breach and other misconduct pertaining to an express contract between plaintiff and defendant consisting of a December 16, 1999 Asset Purchase Agreement and any merged documents, including a September 28, 1998 letter agreement. The cause of action for damages independent of the Tucker Act is endowed by the express contract. Prior to seeking relief in this Court, plaintiff is not required to exhaust any administrative process before the U.S. Department of Agriculture or before any contract board at that agency, or pursuant to the Contract Disputes Act. The December 16, 1999 Asset Purchase Agreement and September 28, 1998 merged letter agreement, are attached and incorporated as Exh. 1.

## December 16, 1999 Asset Purchase Agreement and September 28, 1998 Letter Contract

4. In an Asset Purchase Agreement dated December 16, 1999, and incorporating a September 28, 2998 letter agreement, the Administrator of the Rural Utilities Service ("RUS") of the U.S. Department of Agriculture entered into a contractual agreement with plaintiff Hartland-Contech to sell certain Assets

consisting of a hydroelectric generating power plant, including real property, situated on the Ottaquechee River near North Hartland Lake, Vermont, and denominated FERC Project 2816. Pursuant to Sec. 10.7 of the 1999 Asset Purchase Agreement, defendant RUS consented to anticipated assignment under the Asset Purchase Agreement from Contech Development Company, LLC, to North Hartland, L.L.C.

5. The anticipated sale price in this Asset Purchase Agreement and contract was $1.4 million.

6. The Asset Purchase Agreement identified the Transferor of title to the assets as Attorney Gleb Glinka, the Chapter 7 Trustee of the power plant assets in the U.S. Bankruptcy Court for the District of Vermont, Rutland, Case No. 96-10335. The U.S. Bankruptcy Trustee represented that it ceded all legal title rights to RUS such that RUS was identified in the Asset Purchase Agreement as having full authority to direct the Trustee to deliver assets to the buyer Hartland-CDC at closing, including delivery of one or more quitclaim deeds for conveyance of all purchased assets. APA, ¶4.3(e).

7. The U.S. Bankruptcy Trustee Glinka was paid his final fee in 2000 and the Bankruptcy case was formally closed on July 15, 2000, effectively ending any official role of the Trustee and making delivery of title a ministerial act to be directed by RUS. The bankruptcy Trustee is not an indispensable or necessary

party to this action. There is sufficient privity between the bankruptcy Trustee and defendant RUS that suit against the United States and RUS provides full remedy and relief.

Background to 1999 Asset Purchase Agreement

8. The background of the 1999 Asset Purchase Agreement was that the hydroelectric power plant in Vermont was originally owned and operated by the Vermont Electric Generation & Transmission Cooperative ("VEG&T"), which was a major borrower from the Federal Financing Bank, for which defendant Rural Utilities Services of the U.S. Department of Agriculture served as loan guarantor and agent. In 1996, VEG&T filed a voluntary Chapter 7 Bankruptcy petition, Case 96-10335, U.S. Bankruptcy Court for D. of Vermont, listing the Rural Utilities Service ("RUS") of the U.S. Department of Agriculture as its largest creditor in the amount of $85 million.

Status of the Power Plant Assets

9. The subject VEG&T hydroelectric power plant became inoperative in 1996 upon the bankruptcy filing by VEG&T, but continued to incur expenses for electricity to light the power plant and run its pumps to prevent asset deterioration. The U.S. Army Corps of Engineers also used part of the subject power plant for flood control purposes, with electric charges for this flood control added to the accruing electric bill of the inoperative power plant. The plant and its underlying

real property also continued to accrue local, Town of Hartland, property taxes. The power plant was wholly inoperative and not producing revenue from 1996 through 2005.

10. As part of the Chapter 7 liquidation approved by the U.S. Bankruptcy Court, the defendant RUS, with the approval and signature of the Chapter 7 trustee Gleb Glinka, Esq., entered into a contract for the sale of VEG&T hydroelectric power assets. On September 28, 1998, RUS and plaintiff Hartland-Contech entered into a letter contract for plaintiff Hartland-Contech to purchase the VEG&T, North Hartland hydroelectric assets in "as-is" condition. The September 28, 1998 letter contract, Exh. 1, incorporated RUS's Request for Proposal issued April 28, 1998 and Hartland-Contech's proposal of June 16, 1998 and supplemental letter dated July 24, 1998, which were deemed by RUS and the United States to collectively constitute the "Contract between Contech and the Government. . . .", until such time as an Asset Purchase Agreement was executed. The September 28, 1998 letter agreement contemplated that signature on the Asset Purchase Agreement, *and closing and asset sale*, would occur as early as November 20, 1998, and that "time is of the essence."

11. The Asset Purchase Agreement contemplated by the September 28, 1998 letter contract, attached in Exh. 1, was signed as a contract in December 1999 by authorized officers of the RUS for the United States of America; by Hartland-

Contech; by the Chapter 7 Bankruptcy Trustee Glinka for the bankrupt transferor VEG&T; and was authorized and approved also by the U.S. Bankruptcy Court for the D. of Vermont.

Specific Expectation of Prompt Closing

12. The Asset Purchase Agreement obligated the buyer Hartland-Contech to pay outstanding power plant transfer payments and state taxes; any accrued utility owed by the power plant since 1996; and all FERC license fees. Article III. The Asset Purchase Agreement had an optional closing provision reducing the sale price if the parties closed before March 15, 2000. In any event, the parties intended that closing would occur very promptly after execution of the December 16, 1999 Asset Purchase Agreement, specifically not later than 30 business days following satisfaction or waiver of all closing conditions. ¶4.1 of APA.

Relative Positions of Plaintiff and Defendant Amidst the 1999 Purchase Agreement

13. The defendant RUS knew from reviewing and accepting plaintiff's offer to buy the Vermont hydroelectric assets and from the September 28, 1998 letter contract referenced in the 1999 Asset Purchase Agreement, that buyer Hartland-Contech was a small utility company, led by an experienced and accomplished utility executive, and which was organized principally to purchase the Vermont hydroelectric plant subject of the APA. Defendant RUS also knew that buyer

Hartland-Contech would borrow most of the funds necessary to pay the purchase price for the sale assets subject to the APA.

14. Defendant RUS was a very experienced seller and actor in utility asset sale market, in that defendant RUS had participated in the sale through U.S. Bankruptcy Court proceedings and otherwise, of dozens of utilities that were delinquent on loans due the Federal Financing Bank, were bankrupt, or which had been foreclosed.

15. Because plaintiff Hartland-Contech was a small utility management company dedicated to the purchase of the Vermont hydroelectric plant, it was important for the Asset Purchase Agreement to be successful that closing occur expeditiously. The Asset Purchase Agreement imposed a closing cost upon buyer plaintiff Hartland-Contech that it pay before closing and on behalf of RUS, the local property taxes; electric bill; and FERC licensing fees for the project.

16(a). A lengthier time to closing thus represented increased closing costs for buyer. In addition, because the hydroelectric power plant was idle, a lengthier time to closing caused deterioration and flooding of the physical equipment, increasing insurance and maintenance costs. A lengthy period before closing also impeded plaintiff's efforts to borrow money to purchase the power plant assets, because increasing closing costs, insurance rates, and clean-up expenses drove up re-financing and borrowing fees and interest rates or discouraged some lenders and

equity participants altogether.

16(b). Each month of delay was also a month less of revenue producing time on the FERC license for the Vermont hydroelectric project, which expired in 2021 and was already wasting because the power plant had been idle and not producing revenue since 1996.

17. Despite knowing from its superior bargaining position of this paradoxical "squeeze" position that buyer plaintiff Hartland-Contech was burdened with upon signing the APA and awaiting the closing—with delay increasing plaintiff's costs of and possibly destroying borrowing potential–defendant RUS failed to act expeditiously to close pursuant to the Asset Purchase Agreement and failed to deliver the power plant assets to plaintiff.

18. Plaintiff made its first of many formal requests for RUS to close on the sale in 1999 and consistently renewed its requests for RUS to close at regular times in every year through and including 2005.

19. Though the September 28, 1998 letter contract referenced in the 1999 Asset Purchase Agreement said time was of the essence and anticipated delivery of the hydroelectric plant within 60 days, defendant RUS acted slowly or not at all, and frustrated and breached the APA covenant that the parties would move expeditiously toward closing. In years three and four after the APA was signed, defendant RUS repeatedly refused plaintiff's tender of the purchase price and

otherwise refused to close, and rejected all requests by plaintiff for written waiver or adjustment of APA terms. These waivers and adjustments were specifically contemplated in Sections 7.11 and 10.2 of the APA. This unreasonable conduct of the seller defendant RUS caused delay and tightened the costs squeeze of accumulating property taxes and electric bill charges upon plaintiff Hartland-Contech, forcing plaintiff to search for increasingly more expensive loan commitments. Defendant RUS consistently refused plaintiff's tender of a slightly reduced purchase price that reflected plaintiff's increasing closing costs, which themselves were caused by defendant's delay in closing.

<u>Express and Common-law Implied Covenants of Good Faith and Fair Dealing Upon Defendant United States</u>

20. In addition to the Common Law Covenants of Good Faith and Fair Dealing imposed upon defendant seller RUS entering into the contractual Asset Purchase Agreement, the 1999 Asset Purchase Agreement specifically contemplated that after satisfaction of certain specified Closing Conditions, the United States and RUS would deliver the hydroelectric power plant assets to purchaser Hartland-Contech free and clear of any encumbrances, for a projected purchase price of $1.4 million. Section 2.3 of the Asset Purchase Agreement and directed that the United States and RUS use its best efforts to obtain, prior to the Closing Date, evidence that all encumbrances have been discharged and/or released.

The seller and buyer were not to delay Closing for any non-discharged Encumbrances. Sec. 2.4. In addition, defendant RUS was to join with the plaintiff and the bankruptcy Trustee to jointly forward an Application for Approval from FERC of Transfer of License to the plaintiff buyer, and to do so expeditiously. APA, Sec. 7.8.

State of Vermont PSB and Federal Energy Regulatory Commission

21. Alternatively, the defendant United States of America through the RUS repeatedly represented to plaintiff Hartland-Contech that any licensing or regulatory hurdles with the State of Vermont Public Service Board and the Federal Energy Regulatory Commission prefatory to closing, were perfunctory, and would be navigated expeditiously by defendant RUS or jointly by defendant RUS and plaintiff Hartland-Contech for the benefit of the purchaser, plaintiff Hartland-Contech.

22. Section 6.4(b) of the Asset Purchase Agreement stated that the execution and delivery of assets by RUS to Hartland-Contech did not require any consent, approval, authorization or permit, or filing with or notification to any governmental or regulatory authority, except for a Certificate of Public Good from the Vermont Public Service Board and a transfer license from FERC as specified in APA, Sec. 1.2. In addition, Sec. 7.5 of the Asset Purchase Agreement obligated the United States and RUS to consider any request from Hartland-Contech to execute and

deliver such documents to Hartland-Contech that this buyer may reasonably request, in order to more effectively vest in the buyer Hartland-Contech the transferor's right, title and interest in and to the purchased assets.

23. Section 7.7 of the Asset Purchase Agreement mandated that the seller and buyer ". . . . shall consult with each other at to the appropriate time for filing notifications and shall use their best efforts to make such filings at the agreed upon times, to respond promptly to any requests for additional information made by the agencies. . . ." Section 7.8 required RUS, the buyer Hartland-Contech, and the Chapter 7 Trustee to jointly forward an Application for Approval of Transfer of License for the hydroelectric power facility to the FERC "expeditiously" upon execution of the Asset Purchase Agreement. Section 7.9 of the Asset Purchase Agreement required the RUS and Chapter 7 Bankruptcy Trustee Glinka to expeditiously forward a petition to the Vermont Public Services Board for transfer of the assets subject to the Asset Purchase Agreement in compliance with state law.

24(a). Alternatively, defendant RUS and the United States at all relevant times had superior knowledge to plaintiff Contech-Hartland knew when it entered into the September 1998 letter contract and the December 1999 Asset Purchase Agreement with proposed purchaser Contech-Hartland, that regulatory obstacles before the Vermont Public Service Bureau and the FERC would take several years to overcome and prevent timely closing. These regulatory obstacles were navigated

negligently and incompetently by defendant RUS. In many instances defendant RUS failed to use best efforts or any efforts, example of which was RUS failing to timely secure a Certificate of Consent from the State of Vermont and failing to perfect title transfer between the U.S. Bankruptcy Trustee, VEG&T, and the contractual purchaser, plaintiff Contech-Hartland.

24(b). Alternatively, defendant RUS and the United States knew that, because the plaintiff buyer lacked status as licensee and lacked title in the real property and power plant assets, proposed purchaser Contech-Hartland lacked full standing to participate in the regulatory proceedings before the Vermont Public Utility Commission and Federal Energy Regulatory Commission necessary to enter into transmission line interconnection agreements and power purchase contracts necessary for full licensing authority.

25. Contrary to the representations of the United States and RUS, the proceedings before the Vermont PSB and the FERC were material and protracted because of anomalies committed by VEG&T before filing for Chapter 7 bankruptcy, and were wrongly interpreted by defendant RUS as conditions precedent requiring resolution before the closing contemplated in the Asset Purchase Agreement.

26. The most significant anomaly created by VEG&T and known to the defendant RUS but not disclosed to buyer Contech-Hartland was that VEG&T had

in 1984 made a material change in its transmission line for an interconnection without full regulatory approval from FERC and in violation of the Federal Power Act, 16 U.S.C. §791 et seq.

27. When FERC learned in 2003 of this material change in the project's transmission line, FERC ordered a that the project license be amended. This created an encumbrance on the project that could only be cured by submission of substantial legal and technical documents to FERC. The defendant RUS failed to undertake best efforts to timely cure this encumbrance, and defendant RUS also blocked or impeded plaintiff buyer's attempts to cure the transmission line encumbrance. All pending matters before FERC could have been resolved in days had defendant RUS with or without the Bankruptcy Trustee had used reasonable efforts to solve the interconnection, transmission line issue.

<u>June 27, 2000, FERC Order of Conditional Approval for Transfer of License to North Hartland, LLC</u>

28. On June 27, 2000, the Federal Energy Regulatory Commission ("FERC"), upon the application of the bankruptcy Trustee Glinka made on behalf of plaintiff, approved the transfer of license for the Hartland, Vermont hydroelectric plant to plaintiff's entity North Hartland, LLC, subject to the following conditions:

a. payment by North Hartland, LLC of all FERC charges accruing from 1997 through 2000;

b. transfer of title of the real properties under license to North Hartland, LLC,

which was to be subject to the terms and conditions of the license as thought it were the original licensee, with North Hartland to acknowledge acceptance of the FERC order and to submit certified copies of all instruments of conveyance;

c. submission by North Hartland, LLC within 60 days of the FERC Order, of a Plan and Schedule for returning the power plant project to operation.

29. In the period immediately after the FERC conditional approval of the license transfer to plaintiff Hartland-Contech, this plaintiff reasonably sought and obtained from FERC enlargements of time to submit the certified copies of the conveyance instruments. The question whether this title documentation task should be shouldered by defendant RUS or by seller and buyer jointly, could not be resolved within 60 days of the first FERC order dated June 27, 2000 and was never resolved despite five years of communication between plaintiff and defendant RUS.

30. Because of the inattention of RUS and the Chapter 7 U.S. Bankruptcy Trustee to whether legal title to the hydroelectric plant actually still resided with VEG&T, plaintiff could never obtain a valid opinion on title to the project.

31. VEG&T was defunct and without persons or lawyers to assist in clarifying the title issue.

32. Plaintiff Hartland-Contech even offered, without meaningful response from defendant RUS, to merge with, or purchase any identifiable assets of VEG&T, in order to assume de jure any title rights residing with VEG&T. Defendant RUS failed repeatedly to assist in resolving the title issue.

## Dwindling License Term for Project

33. The license for this Hartland, Vermont hydroelectric power plant had first been issued by FERC in 1981 to the Vermont Electric Cooperative for a forty-year term ending in 2021. The license had been transferred from the Vermont Electric Cooperative to VEG&T in 1983, with the approval of RUS.

34. Basic utility industry economics, including loan analysis by any prospective lender to plaintiff, amortizes expenses and revenue over the forty-year term of this license. With closing not yet achieved and with the Hartland, Vermont plant idle since 1996 and not producing revenue, the accruing electric bills to light the plant and operate pumps at the plant to prevent further deterioration of assets, and the accruing property taxes on the real property underlying the power plant, were a growing expense to be amortized against an undeterminable revenue restart date and a shrinking licensing period through 2021. Though fully aware of this uneconomical paradox burdening prospective buyer plaintiff, defendant RUS repeatedly rebuffed plaintiff's requests for ways to expedite closing and halt these accruing expenses.

35. Defendant RUS also repeatedly rebuffed plaintiff's reasonable requests to cooperate in a joint effort to re-commission the subject power plant, return the plant to operation, and to share revenue with RUS.

36. Lenders evaluating plaintiff's planned use of the power plant assets as

collateral to a loan reasonably required insurance on the plant assets. Lacking title or access to the power plant in the pre-closing period, plaintiff Hartland-Contech could not stanch the accumulating deterioration and corrosion of the idle hydroelectric power plant machinery and equipment and could not arrange suitable insurance. Defendant RUS breached good faith and fair dealing covenants embedded in the 1999 Asset Purchase Agreement by not abating or remediating the deteriorating physical assets from 1999 forward.

<u>February 11, 2003 Conditional Certificate of Consent Issued by Vermont Public Service Board</u>

37. Acting upon joint petitions by the bankruptcy Trustee and plaintiff Hartland-Contech submitted three years earlier, the Vermont Public Service Board on February 11, 2003, issued Certificates of Consent to the Trustee and defendant RUS, with the following conditions:

a. North Hartland [plaintiff] shall not operate the project until an interconnection agreement with Central Vermont Public Service Corporation has been approved and approved by the Vermont Public Service Board;

b. North Hartland [plaintiff] shall not sell production from the project to any Vermont utility pursuant to a long-term and/or levelized power sales contract until said contract has been reviewed and approved by the Vermont Public Service Board.

38. The Vermont Public Service Board's conditional Certificate of Consent bearing on the interconnection agreement, also referenced the serious primary transmission line issue, supra ¶s 26-27, that materially affected the FERC license for the subject power plant and required elaborate and costly submissions to FERC prefatory to obtaining major FERC determinations under the Federal Power Act. Neither VEG&T, RUS, nor the Chapter 7 U.S. Bankruptcy Trustee would make the required filings with FERC needed to resolve the primary and interconnection transmission line issues, despite plaintiff's repeated requests.

39. Plaintiff itself attempted to resolve the primary transmission line issue before FERC. Because plaintiff North Hartland was not the original licensee, FERC would not act on any of plaintiff's several submissions to that commission, each of which of which was undertaken at plaintiff's expense and time. Resolution of the interconnection matter was largely impossible given that plaintiff was not considered the original licensee and did not have title in the real property associated with the primary and interconnected transmission lines.

40. Defendant RUS rejected all of plaintiff's requests in 2002, 2003, and 2004 to close on the Asset Purchase Agreement during the pendency of the transmission line and power-purchase-agreement conditions, and while the local property taxes and licensing proceedings costs were mounting. By refusing to resolve these conditions and refusing to close, Defendant RUS thereby failed to

undertake best efforts or reasonable efforts, and breached the 1999 Asset Purchase Agreement.

FERC 2003 Order for License Modification

41. The Bankruptcy Trustee and defendant RUS knew or should have known that when the Hartland, Vermont hydroelectric power plant was operating under auspices of VEG&T, that company in 1984, without prior approval from FERC, changed the location of its primary line by adding a northern interconnection device. When the FERC learned of this modification, the FERC in 2003, while the plant was inoperable and the object of the Asset Purchase Agreement for sale to plaintiff, ordered the license of the Hartland, Vermont power plant to be amended to cure what was effectively a violation of the Federal Power Act's primary transmission line requirements by the original licensee, VEG&T. This order of licensing amendment mandated formal participation before the FERC by the original licensee and by the most-affected state regulatory body, the Central Vermont Public Service Corporation, and also required the expectant purchaser, plaintiff herein, to undertake a major utility project legal submission to FERC. Alternatively, defendant RUS should have worked jointly with the buyer plaintiff to submit the necessary license amendment package to FERC.

Lack of Cooperation and Breach of Good Faith and Fair Dealing Covenant by Defendant

42. At all relevant times while the hopeful purchaser plaintiff was facing regulatory obstacles on the modification of the FERC license and the interconnection and power purchase obligations before FERC, the Vermont Public Service Board and the Central Vermont Public Service Corporation, defendant RUS, and the U.S. Bankruptcy Trustee, failed to cooperate or assist plaintiff in closing and failed to move expeditiously toward closing as intended in the 1999 Asset Purchase Agreement. At the same time, Defendant RUS let the power plant assets deteriorate, impeded and delayed plaintiff from physically inspecting the power plant assets, and failed to join with or assist plaintiff in his ongoing required filings with the FERC or with the Vermont Public Service Board or the Central Vermont Public Service Corporation. To this day, defendant RUS has never communicated to plaintiff who had the filing obligations with FERC and the Vermont regulatory authorities that would have facilitated closing with plaintiff on the 1999 Asset Purchase Agreement.

43(a). Plaintiff North Hartland at great expense performed duties that should have been performed by defendant RUS to effectuate closing. Defendant RUS failed to make any appearance at FERC to attempt to implement the Asset Purchase Agreement until 2003.

43(b). In 2004, defendant RUS unilaterally petitioned FERC to revoke the license transfer order in favor plaintiff, which FERC did. After defendant RUS arranged to sell the Vermont hydro power plant assets to buyer other than plaintiff, defendant RUS petitioned RUS to have the license order reinstated so that the new buyer could complete purchase of the hydro power plant assets.

44. At material times, defendant RUS objected to plaintiff's standing before FERC, thereby breaching the Asset Purchase Agreement and damaging plaintiff.

45. Defendant RUS failed to assist plaintiff or use best efforts while plaintiff waited from August 17, 2000 until February 11, 2003 when the Vermont Public Service Board issued the conditional Certificates of Consent for the Hartland, Vermont power plant referenced in ¶ 37, supra.

46. Plaintiff repeatedly requested defendant RUS and the Bankruptcy Trustee to assist plaintiff before the Vermont regulatory authorities and obtain resolution of the primary and interconnection line dispute so that RUS would close on the Asset Purchase Agreement. Plaintiff also repeatedly tendered payment contemplated under the 1999 Asset Purchase Agreement and requested defendant RUS to close on that Agreement. Defendant RUS unreasonably rejected all of these requests, and wrongly asserted that plaintiff's obligations to FERC and Vermont regulatory authorities, including the Town of Hartland as to property taxes, were encumbrances needing to be satisfied in full before closing. At material times,

defendant RUS diverted plaintiff into dealing with Civil Division attorneys, including bankruptcy lawyers, at the U.S. Department of Justice in Washington, D.C., who had zero capability to close on the Asset Purchase Agreement.

47. From 2000 through 2004, plaintiff made several reasonable proposals to close on the APA, including proposing plans for joint operation of the plant by plaintiff and defendant to mitigate deterioration. Defendant wrongly refused to accept these offers to close on the signed APA.

48(a). At several material times, the defendant United States and RUS actually objected to and blocked plaintiff Hartland-Contech's participation and standing before the Vermont PSB and FERC, to the detriment of plaintiff Hartland-Contech, which buyer never did close on the Asset Purchase Agreement. This affirmative conduct of the United States amounted to tortious interference with plaintiff Hartland-Contech's contract rights under the Asset Purchase Agreement, and amounted also to tortious interference with plaintiff's prospective economic dealings and qualification before Vermont and Federal regulatory authorities.

48(b). Though FERC penalties against the original licensee VEG&T accruing until 1997 were dissolved by the U.S. Bankruptcy Court, FERC took the position that penalties accruing after 1997 in amount as large as $10,000 per day could be levied by FERC against the legal entity, i.e., plaintiff, which was seeking to substitute for the original but bankrupt FERC licensee. These liability for these

penalties was damaging to the borrowing capacity of plaintiff Contech-Hartland in the eyes of its lenders.

Plaintiff's Damages Anticipatory to Closing

49. In attempting to close on the Asset Purchase Agreement from December 1999 through January 2005 when the plaintiff's purchase rights under the APA were sold at fire-sale rate to another utility operator, plaintiff Contech-Hartland expended more than $850,000 in technical consulting services, legal expenses, project engineering, regulatory filing fees, and in man-hours of managers of the plaintiff's limited liability company. These expenditures and efforts, despite the contract breach and lack of good faith effort by defendant RUS, materially contributed to bringing the asset sale to closing in 2005, albeit to a buyer other than plaintiff.

Defendant RUS Lack of Intent to Close

50 . Alternatively, defendant United States of America and RUS lacked intent to deliver the assets promised when the United States signed the December 1999 Asset Purchase Agreement contract, which amounted to a false representation of a material fact made knowingly by defendant. Defendant wrongfully failed to close with plaintiff upon the 1999 Asset Purchase Agreements, despite plaintiff fulfilling all conditions to close and making adequate tender. Alternatively, if defendant RUS

signed the Agreement in December 1999, this defendant later abandoned intent to close but did not disclose this material change to plaintiff.

51. Defendant RUS never held or acquired adequate title to the power plant real property, assets, and license, and could not close.

Defendant RUS Sale of Assets to Another Buyer

52(a). In 2003 and 2004, Defendant RUS, without advance notice to plaintiff, unlawfully invited bids on the subject power plaint from other potential buyers, and by dealing with these third parties breached the contract with plaintiff North Hartland.

52(b). These unlawful invitation for bids by defendant RUS were enabled by plaintiff's efforts and expenditures making sale of the Vermont hydro-electric asset possible.

52©. The defendant RUS invitation for bids also, however, disclosed confidential facts occurring after the 1999 APA had been signed, and invited bids on more favorable terms than contracted between defendant RUS and plaintiff. In addition, these dealings by defendant RUS with potential new buyers disclosed false information about plaintiff Hartland's corporate registration status in Vermont and New Hampshire. These intentional actions by defendant constituted breach by defendant RUS of its contract with plaintiff.

53. Defendant RUS and United States knew that plaintiff would reasonably

rely on and act upon the promise by defendant RUS in the 1999 Asset Purchase Agreement to move toward closing expeditiously.

54. Plaintiff did rely and act upon the contractual promise of defendant RUS to his detriment, and plaintiff forbore taking other actions to its benefit, all in reliance upon the promise of defendant RUS.

Sale of Asset to New Buyer: Essex Hydro Associates, LP

55(a). Plaintiff's reliance upon the representations of defendant RUS were all to his detriment and directly and proximately caused plaintiff damages in the form of loss of expectancy; loss of benefit of the bargain and loss of profits; reliance damages for all his reasonable but ultimately futile expenditures aimed at closing; and restitution damages for restoration of benefits conferred upon defendant RUS, which was able to evade closing with plaintiff and instead sell the Vermont power plant to another party.

55(b). But for plaintiff's expenditure of massive project management, engineering, and legal expenses attempting to cure perceived regulatory hurdles, defendant RUS would not have been able to sell the assets to another purchaser. These expenditures of plaintiff amounted to a benefit conferred upon defendant RUS as well as unjust enrichment of defendant RUS.

56. The defendant RUS applied the benefit of these expenditures by plaintiff not to the betterment of plaintiff North Hartland, but instead to the benefit of

defendant RUS and the new buyer, Essex Hydro Associates, LP/Concord Hydro Associates, LP, which purchased the hydro-electric power plant asset (FERC Project No. 2816) from defendant RUS in approximately January, 2005.

57. These aforementioned allegations in these subparagraphs constitute contract fraud and misrepresentation liability of this defendant, which proximately damaged plaintiff.

Limited Assignment in 2005 of Purchase Rights By Plaintiff

58. Prevented from closing by defendant United States and RUS's breach of contract, lack of best efforts, interference in plaintiff's standing and advocacy before FERC and Vermont regulatory agencies, and, alternatively, fraud and misrepresentation, plaintiff Hartland-Contech was compelled in 2005 to make a partial assignment limited to its purchase rights under the 1999 Asset Purchase Agreement, to another purchaser, for consideration well less than the 1999 or 2005 value of the asset.

59. Plaintiff's contract rights and other legal remedies against RUS were reserved and not assigned. Any documents signed by Hartland-Contech in this assignment for consideration preserved and did not waive or release, any or all claims and causes of action on behalf of Hartland-Contech against the United States and RUS, or against any other party liable to Hartland-Contech pursuant to the breached 1999 Asset Purchase Agreement. Nor did any action of plaintiff ratify or

waive any breach of contract by defendant pleaded herein.

60. All cause of action and claims for damages against the United States and RUS are preserved and reserved by plaintiff, and are viable. The assignment by plaintiff of its rights to purchase the subject hydro- electric plant did not waive plaintiff's causes of action for damages against defendant RUS, nor did plaintiff's assignment waive remedies for, or ratify, any action or misconduct of RUS.

61. With the enormous increase in hydroelectric power rates and revenue potential between 1999 and 2006, the coerced assignment for minimal consideration by Hartland-Contech of its purchase rights to the Vermont hydroelectric plant, amounted to a waste of an asset worth dramatically more than the $1.4 million contemplated closing price. The assignee purchaser of the Vermont hydroelectric plant subject to the 1999 Asset Purchase Agreement can reasonably sell or "flip" the hydro-electric asset for as much as $9.5 million in today's electric power revenue market.

## Count 1: Breach of Contract

62. Paragraphs 1 through and including 61 are incorporated by reference.

63. Defendant RUS at all times had authority to bind the United States and make the United States liable to plaintiff for contract and fraud damages, and defendant RUS did bind the United States and make the United States liable to plaintiff for contract and fraud damages.

64(a). Defendant RUS/United States by failing to undertake best and reasonable efforts; by delaying for since 1999; and by never closing or delivering upon the Asset Purchase Agreement to plaintiff and coercing plaintiff to assign the Asset Purchase Agreement in 2005, breached the Asset Purchase Agreement. Plaintiff Hartland-Contech fulfilled all performance obligations on its side of the contract, including tender of the purchase price, and was proximately damaged by defendant's breach. Plaintiff accordingly demands judgment for contract breach against defendant RUS/United States for compensatory damages in the form of form of loss of expectancy including pursuant to the "wounded bank" interpretation of damages by this Court; loss of benefit of the bargain and loss of profits; reliance damages for all his reasonable but ultimately futile expenditures aimed at closing; diminished value; and restitution damages for restoration of benefits conferred upon defendant RUS; and to remedy unjust enrichment of defendant, in the amount of $9.5 million, plus costs, and including $850,000 of direct attorney, engineering, consulting, and project management fees expended by plaintiff through 2005.

64(b). Plaintiff also requests a finding for all counts that plaintiff is the prevailing party in this contract and fraud matter, for award of attorneys fees and for all other determinations.

Count 2: Breach of Common Law Covenants and Express Terms of Good Faith and Fair Dealing, including Tortious Interference with Plaintiff's Standing and Prospective Advantage With Regulatory Agencies

65. Paragraphs 1 through and including 64 are incorporated by reference.

66. Defendant RUS/United States by failing to undertake best and reasonable efforts and by delaying for six years and never closing or delivering upon the Asset Purchase Agreement with plaintiff, and by hindering, interfering with, frustrating, and obstructing plaintiff's communication and advocacy with the Vermont state regulatory authorities and the Town of Hartland, the U.S. Army Corps of Engineers, and with the FERC, defendant destroyed plaintiff's reasonable expectations regarding the fruits of the 1999 Asset Purchase Agreement, i.e., closing and tender of the hydroelectric power plant. In addition, defendant hindered and frustrated plaintiff's reasonable expectation from the Asset Purchase Agreement that plaintiff buyer and defendant seller would work jointly to expeditiously close on the Asset Purchase Agreement. This defendant RUS' conduct amounts to breach of the common law duties of good faith and fair dealing, defendant's obligation to which was magnified by express reference to parties' joint commitment to expeditious closing in the text of the Asset Purchase Agreement.

67. This conduct of defendant also amount to tortious interference with plaintiff's standing and licensing/certificate of convenience advocacy before FERC and Vermont regulatory agencies, thereby preventing plaintiff from obtaining those

regulatory agencies approvals necessary for plaintiff to receive the sale assets at closing.

68. Defendant RUS/United States are accordingly liable to plaintiff for this breach of common law and express contract doctrines of good faith and fair dealing, including tortious interference with prospective economic relationship and advantage, which breach and interference proximately damaged plaintiff, and plaintiff demands judgment against defendant RUS/United States in the amount of $9.5 million, including attorneys fees and costs.

Count 3: Alternative Count for Fraud and Misrepresentation

69. Paragraphs 1 through and including 68 are incorporated by reference.

70. Alternatively, defendant United States of America and RUS lacked intent to deliver the assets promised when the United States signed the September 1998 letter of intent and December 1999 Asset Purchase Agreement contract, which amounted to a false representation of a material fact made knowingly by defendant. Defendant concealed this lack of intent until 2005. Defendant wrongfully failed to close with plaintiff upon the 1999 Asset Purchase Agreements, despite plaintiff fulfilling all conditions to close and making adequate tender. Alternatively, if defendant RUS did not lack intent to close on the Asset Purchase Agreement when defendant RUS signed the Agreement in December 1999, this defendant later abandoned intent to close but did not disclose this material change to plaintiff.

71. Defendant RUS and United States knew that plaintiff would reasonably rely on and act upon the promise by defendant RUS in the 1999 Asset Purchase Agreement to move expeditiously toward closing and undertake best efforts to achieve closing, which was contemplated by defendant RUS in the September 1998 letter contract to occur within months of the signed Asset Purchase Agreement. When plaintiff requested that defendant RUS close in years two and three after signature upon the Asset Purchase Agreement, defendant RUS unreasonably refused. Under the terms of the Asset Purchase Agreement, defendant RUS could have closed with plaintiff and sold the hydroelectric plant to plaintiff, within months after signature upon the 1999 Asset Purchase Agreement. This delay in closing was in bad faith, was unconscionable, and unfairly increased plaintiff's foreseeable closing costs, making continued participation in the APA ruinous to plaintiff and anathema to any lender to plaintiff.

72. Plaintiff did rely and act upon the contractual promise of defendant RUS to his detriment, and plaintiff forbore taking other actions to his benefit, both in reliance upon the promise of defendant RUS.

73. Plaintiff's reliance upon the representations of defendant RUS was all to his detriment and directly and proximately caused plaintiff damages in the form of loss of expectancy; diminished value of the Vermont hydroelectric power plant; accrual of large electric bills and property tax debts obligated to

plaintiff; loss of benefit of the bargain and loss of profits; expenditure of reasonable project engineering and attorney expenditures aimed at closing; and restitution damages for restoration of benefits conferred upon defendant RUS, which was unjustly enriched; able to avoid closing with plaintiff; and enabled to sell the Vermont power plant to another party in 2005.

74. The aforementioned allegations in these subparagraphs constitute this defendant's contract fraud and misrepresentation toward the plaintiff. Plaintiff Contech-Hartland accordingly demands judgment against defendant RUS/United States in the amount of $9.5 million, plus attorneys fees and costs.

Respectfully submitted,

John S. Lopatto III, Member Bar, U.S. Court of Federal Claims
1725 Eye St., Suite 300
Washington, D.C. 20006
202-861-5800
Virginia Office:
803 Gibbon St., Suite 200
Alexandria, VA 22314
703-548-8254/4310

E-fax to all offices: 202-861-5802 or 202-315-3850
Email: Jlopatto3@aol.com or Jlopatto3@gmail.com

June 29, 2006

# ASSETS PURCHASE AGREEMENT

This Assets Purchase Agreement ("Agreement"), dated as of December 16, 1999, by and between the United States of America, acting through the Administrator of the Rural Utilities Service ("RUS"), Contech Development Company, L.L.C. ("CDC"), a New Hampshire domestic limited liability company, and the Vermont Electric Generation & Transmission Cooperative, Inc. ("VEG&T") acting through Gleb Glinka Esq., the Chapter 7 Trustee of the VEG&T bankruptcy estate ("Transferor"), which together may be collectively referred to herein as the "Parties" or individually as the "Party".

WHEREAS, the CDC desires to purchase, and the RUS desires that the Purchased Assets (as hereinafter defined) be transferred upon the terms and conditions hereinafter set forth; and

WHEREAS, THE CDC and RUS entered into a Contract for the transfer and purchase of the Purchased Assets and said Contract required the CDC and RUS to negotiate an asset purchase agreement, expeditiously and in good faith.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the Parties hereto agree as follows:

## Article 1 Definitions

As used in this Agreement, the following terms have the meanings specified in this Article 1.

1. "Business Day" shall mean any day other than Saturday, Sunday, a legal holiday or a day on which banking institutions in Montpelier, Vermont are authorized by law or other governmental action to close.

2. "CDC Required Regulatory Approvals" means those approvals and certificates required by and from federal, state, and local governmental agencies which are necessary and required for the consummation of the transaction contemplated herein, which include but are not limited to (i) the FERC order permitting the transfer of the North Hartland Project, FERC Project 2816 to CDC, and (ii) the VT PSB order granting to CDC a certificate of public good.

3. "CDC Representatives" means the CDC's accountants, counsel, environmental consultants, financial advisors and other authorized representatives.

4. "CDC" means Contech Development Company, L.L.C., the limited liability company formed in New Hampshire, which provides technical and managerial services for the development of power generation facilities.

5. "Contract" means the September 28, 1998 letter contract, executed by the RUS and CDC.

WB



PLAINTIFF'S EXHIBIT
1

6. "Closing Date" means the date thirty days, or earlier if agreed to by RUS and CDC, after the date when all Closing Conditions have been satisfied; and it is the date on which the CDC, RUS, and the Transferor will discharge their respective responsibilities as set forth in this Agreement.

7. "Closing Conditions" means all of the conditions specified in Article VIII.

8. "Effective Date" and "Effective" means the date the Parties to this Agreement have executed it.

9. "Encumbrances" means any mortgages, pledges, liens, security interests, licenses, activity and use limitations, conservation easements, easements, deed restrictions, encumbrances and charges of any kind.

10. "FERC" means the Federal Energy Regulatory Commission.

11. "Material Adverse Effect" means the direct result of an event, including events legal or regulatory in nature, occurring between the Effective Date and the Closing Date, which prevents physical operation of the Purchased Assets until the obstruction created by such event is removed.

12. "Order on Stipulated Settlement of Claims" means the June 11, 1997 order issued by Hon. Francis G. Conrad, United States Bankruptcy Judge For the District of Vermont (Case NO. 96-10335) which orders and approves the Settlement Agreement, which incorporates into the order the Settlement Agreement, and which authorizes the parties thereto to prepare and execute any and all additional documentation needed to fulfill the terms and conditions of the Settlement Agreement.

13. "VT PSB" means the Vermont Public Service Board located in Montpelier, VT.

14. "Purchased Assets" means any interest of VEG&T in the realty, personal property, improvements, fixtures, licenses contracts, connected with the hydroelectric generating facility at or near the North Hartland Lake, Vermont.

15. "RUS" means the Rural Utilities Service an agency within the U.S. Department of Agriculture

16. "RUS Regulatory Approvals" means those approvals of, declaratory orders for, and required actions by federal, state, and local governmental agencies including Transfer Proceedings, as defined in the Settlement Agreement, that RUS will obtain, for the consummation of the transaction contemplated herein, which include (i) FERC approval of and authorization for disposition by transfer of its North Hartland Project, FERC Project 2816, and transfer of the FERC license, and (ii) VT PSB approval of the disposition by transfer of the Purchased Assets, and compliance with state laws.



WB
N

17. "RUS Representative" means the Administrator of the Rural Utilities Service, U.S. Department of Agriculture, or a person legally designated the authority to act on behalf of the Administrator.

18. "Settlement Agreement" means Stipulated Settlement of Claims and Motion for Approval Thereof on Shortened Notice, dated June 6, 1997, by and between Gleb Glinka, Esq., Chapter 7 Trustee of the estate of VEG&T; the RUS; the Town Of Hartland, Vermont; the National Rural Utilities Cooperative Finance Corporation; CoBank, ACB; Central Vermont Public Service Corporation ("CVPSC"); and Massachusetts Municipal Wholesale Electric Company, and filed on that same date in the United States Bankruptcy Court, District of Vermont, in Re: Vermont Electric Generation & Transmission Cooperative, Inc., Debtor, Case No. 96-10335, a copy of which is attached hereto in Exhibit A. The CDC is not a Party to this Settlement Agreement and relies on RUS's representations concerning same.

19. "Trustee" or "Transferor" means Gleb Glinka, Esq., of Glinka & Schwidde and any successor thereto, appointed by the United States Bankruptcy Court for the District of Vermont, Rutland, VT, to be the Chapter 7 Trustee of the estate of Vermont Electric Generation and Transmission Cooperative, Inc., (Case No. 96-10335).

## ARTICLE II PURCHASE AND TRANSFER

2.1 Upon the terms and subject to the satisfaction of the Closing Conditions contained in this Agreement, at the Closing the RUS will cause the Transferor to assign, convey, transfer and deliver a title, which is free and clear of any and all Encumbrances, to the CDC, and the CDC will purchase and acquire from the Transferor, free and clear of any and all Encumbrances, all of the Transferor's right, title and interest in and to the Purchased Assets.

2.2 The CDC will prepare a motion to the United States Bankruptcy Court for the District of Vermont (Court) to request a Court order ordering the discharge of any and all Encumbrances directly or indirectly related to the Purchased Assets as of the Closing Date.

2.3 In addition to seeking the Court order referenced in Section 2.2, CDC may perform Uniform Commercial Code lien and litigation searches to ascertain the existence of any Encumbrances on the Purchased Assets that arose subsequent to the date of the Order on Stipulated Settlement of Claims and prior to the Closing Date. If CDC's search reveals the existence of any such Encumbrances, CDC will immediately notify RUS, and if CDC is unable to obtain the Court order referenced in Section 2.2, then RUS, working together with CDC, will use its best efforts to obtain, prior to the Closing Date, evidence that such Encumbrances have been discharged and/or released.



LAP

W

2.4 If neither the Court order referenced in Section 2.2 nor the evidence of discharge and/or release referenced in Section 2.3 is obtained prior to the Closing Date, then, until the earlier of (i) 360 calendar days from the Closing Date, or (ii) the issuance of the Court order referenced in Section 2.2, the RUS, working together with CDC, agrees to continue to use its best efforts to discharge any specifically identified and non-discharged Encumbrances existing as of the Closing Date. In any event, the Parties will not delay the Closing for such non-discharged Encumbrances.

## ARTICLE III PURCHASE PRICE

The Purchase Price for the Purchased Assets shall mean ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000; the "Purchase Price") and shall be set forth in the bill of sale, as modified by the permitted adjustments set forth below. The Purchase Price will be adjusted for amounts hereinafter described that are (i) paid by the CDC on behalf of the RUS and (ii) that are hereinafter agreed on or negotiated in good faith by the RUS and the CDC. The Purchase Price is allocated as follows:

| | |
|---|---|
| Real Property & Improvements | $ none |
| Personal Property | $1,400,000.00 (Equipment) |
| Total Purchase Price | $1,400,000.00 |

CDC shall report the transactions contemplated by the Agreement for federal income tax and all other tax purposes in a manner consistent with the allocation determined above.

Except to the extent specifically provided herein, all costs and expenses (i.e., application and filing fees, expenses related to the regulatory approval process, etc.) incurred in connection with each Party's responsibilities under this Agreement and the transaction contemplated hereby shall be borne by the Party incurring such costs and expenses. Specifically, with regard to closing and transfer expenses, each Party will pay those closing and transfer expenses that customarily would be paid by a seller/transferor or buyer/transferee, except as noted herein.

Specific obligations CDC will pay:

1. The total outstanding Hartland Transfer Payment and Hartland Future Tax, as defined in the Settlement Agreement;
2. The CVPSC utility bill; and
3. All FERC license fees.

Specific obligations RUS will pay: NONE

Dr. Yang 2 pm wed McCann O-18 6707 Old Dominion Dr. 300



LAB
R

## ARTICLE IV THE CLOSING

4.1 Subject to satisfaction of the Closing Conditions, the closing of the transfer and purchase of the Purchased Assets contemplated by this Agreement ("Closing") will take place at the offices of the Town Manager, Hartland Vermont at 10:00 A.M. on such date as the Parties may agree, which date is as soon as practicable, but no later than thirty (30) Business Days following the date on which all of the Closing Conditions have been satisfied or waived; or at such other place or time as the Parties may agree.

4.2 Upon the terms and subject to the satisfaction of the Closing Conditions in consideration of the aforesaid assignment, conveyance, transfer and delivery of the Purchased Assets, the CDC will pay or cause to be paid to the RUS the Purchase Price, less any adjustments which have been permitted in this Agreement.

4.3 At the Closing, the RUS will deliver or cause to be delivered to the CDC the following items:

(a) A bill of sale
(b) RUS Regulatory Approvals
(c) A copy of the opinion of RUS's counsel, as provided by RUS's counsel to RUS, stating that the RUS Representative has the authority to execute and deliver the Agreement and any other necessary agreements to consummate this transaction, and that the Agreement and any other necessary agreements are validly executed.
(d) A release of RUS's lien on VEG&T's interest in the Purchased Assets.
(e) One or more quitclaim deeds for conveyance of the Purchased Assets, duly executed by the Trustee and acknowledged by the RUS;

4.4 At the Closing, the CDC will deliver or cause to be delivered to the RUS the following:

(a) The Purchase Price by wire transfer, adjusted as permitted herein.
(b) A satisfactory release from liability from the Town of Hartland as required by the Settlement Agreement.
(c) Evidence that the CVPSC electric utility bill has been paid.
(d) Evidence that the FERC License Fees have been paid.
(e) CDC Required Regulatory Approvals.

## ARTICLE V CDC REPRESENTATIONS AND WARRANTIES

5.1 CDC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New Hampshire.

5.2 CDC has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the CDC.



UAB
N

5.3. There are no pending legal, arbitration, or governmental actions or proceedings to which CDC is a party and to CDC's knowledge, no such actions or proceedings are threatened or contemplated.

## ARTICLE VI RUS / TRANSFEROR REPRESENTATIONS AND WARRANTIES

6.1 RUS is an agency of the United States Government, within the U.S. Department of Agriculture, duly organized and validly existing under the laws of the United States. It has all requisite authority to own, lease, sell, and to carry on its business as is now being conducted and as contemplated by this Agreement.

6.2 RUS has the authority per the terms of the Settlement Agreement to execute and deliver this Agreement and to consummate the transaction contemplated hereby.

6.3 This Agreement has been duly and validly executed and delivered by the RUS.

6.4 Except for such notices or approvals set forth herein, and other than obtaining the RUS Regulatory Approvals and the CDC Required Regulatory Approvals, neither the execution and delivery of this Agreement by the RUS nor the transfer of the Purchased Assets pursuant to this Agreement will:

(a) conflict with or result in any breach of any of the rules and regulations of the RUS,
(b) to the knowledge of RUS, require any consent, approval, authorization or permit of, or filing with or notification to any governmental or regulatory authority,
(c) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the RUS,

6.5 RUS has the authority per the terms of the Settlement Agreement to instruct the Trustee to convey, transfer and assign all title to and interest in the Purchased Assets to the CDC.

6.6 To the best of RUS's knowledge, there are no current claims, actions, proceedings or investigations pending or, to the best of RUS's knowledge, threatened against or relating to the Purchased Assets before any court, governmental or regulatory authority or body acting in an adjudicative capacity, which, if adversely determined, would have a Material Adverse Effect. The White Current Adversary, as defined in the Settlement Agreement, is solely a RUS responsibility.

6.7 The Transferor has the authority per the terms of the Settlement Agreement to perform its respective obligations described herein and has taken all necessary actions, obtained all necessary approvals, and there is no pending legal action, to which it is a party, which might adversely effect its ability to perform its obligations under this Agreement.

## ARTICLE VII COVENANTS OF THE PARTIES

7.1 From the date of this Agreement to the Closing Date, the RUS may, in its sole discretion, make such maintenance and capital expenditures to the Purchased Assets, as the RUS deems



WAB

necessary.

7.2 Prior to the Closing Date, without the prior written consent of the CDC, the RUS will not with respect to the Purchased Assets:

(i) Cause the Trustee to sell, lease (as lessor), transfer or otherwise dispose of, any of the Purchased Assets, other than assets used, and not pledge, or impose or suffer to be imposed any Encumbrance on, any of the Purchased Assets;

(ii) Cause the Trustee to enter into or amend any real or personal property tax agreement, treaty or settlement affecting or relating to the Purchased Assets;

7.3 Between the date of this Agreement and the Closing Date, the RUS will, during ordinary business hours and upon reasonable notice to RUS, and to the extent permitted under applicable law, (i) give the CDC and the CDC Representatives reasonable access to all books, records, and plans, stored in the RUS office in Washington (ii) furnish the CDC with such financial and operating data and other information in the RUS's possession with respect to the Purchased Assets as the CDC may from time to time reasonably request and as may be required to be furnished by RUS to CDC according to FERC regulations for hydroelectric facilities; and (iii) furnish the CDC a copy of each material report, schedule or other document filed or received by them with respect to the Purchased Assets with the Securities Exchange Commission, VT PSB or FERC.

7.4 RUS anticipates that CDC will request access to the facility to perform inspections, cleanup of the facility and routine maintenance of the equipment. Between the Effective Date and the Closing Date, the RUS will, during ordinary business hours, upon reasonable notice by CDC to RUS, and with RUS's written permission, allow CDC and CDC Representatives to enter on to the North Hartland hydroelectric facility (FERC Project No. 2816) to perform inspections, cleanup, and routine maintenance of the facility. RUS will not unreasonably withhold CDC access to the facility. Prior to performing such inspections, cleanup or routine maintenance, CDC will inform RUS, in writing, of the scope of work to be performed at the facility, and provide or cause to be provided to RUS an insurance certificate, in form and substance satisfactory to RUS, that provides for the appropriate levels of liability and damage coverage. Performance of such inspections, cleanup and routine equipment maintenance shall be at the risk and expense of CDC.

7.5 From time to time after the date hereof, without further consideration, the RUS will consider any request from CDC to execute and deliver such documents to the CDC as the CDC may reasonably request in order to more effectively vest in the CDC the Transferor's right, title and interest in and to the Purchased Assets.

From time to time after the date hereof, the CDC will consider any request from RUS to execute and deliver such documents to the RUS as the RUS may reasonably request in order to more effectively consummate the transfer of the Purchased Assets pursuant to this Agreement.



LAB

7.6 The Parties shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transaction contemplated hereby and shall not issue any such public announcement, statement or other disclosure prior to such consultation, except as may be required by law.

7.7 The Parties shall consult with each other as to the appropriate time of filing notifications and shall use their best efforts to make such filings at the agreed upon times, to respond promptly to any requests for additional information made by agencies, and to cause the applicable waiting periods to terminate or expire at the earliest reasonable date after each date of filing. The Parties agree that they will keep each other informed of the progress and actions related to complying with and completing all actions and requirements provided in this Agreement.

7.8 The RUS, CDC and Transferor agree to jointly forward an Application for Approval of Transfer of License, Project 2816-001, to the FERC, expeditiously upon execution of this Agreement.

7.9 RUS/Trustee shall forward a petition to the VT PSB for approval of the disposition by transfer of the Purchased Assets and compliance with state laws, expeditiously upon execution of this Agreement.

7.10 CDC shall forward a petition to the VT PSB requesting that the VT PSB grant to CDC a certificate of public good, expeditiously upon execution of this Agreement.

7.11 If before the Closing Date all or any material portion of the Purchased Assets are damaged or destroyed by fire or other casualty, the RUS shall immediately notify the CDC in writing of such fact. If such damage or destruction would have a Material Adverse Effect and the RUS has not notified the CDC of its intention to cure such damage or destruction within fifteen (15) days after its occurrence, the CDC and the RUS shall negotiate in good faith to settle the loss resulting from such casualty (including, without limitation, by making a fair and equitable adjustment to the Purchase Price) and, upon such settlement, consummate the transaction contemplated by this Agreement pursuant to the terms of this Agreement. If no such settlement is reached within sixty (60) days after the RUS's having notified the CDC of such casualty, then the CDC may terminate this Agreement.



LAB

N

**ARTICLE VIII CLOSING CONDITIONS**

8.1 The respective obligations of each party to effect the transfer, and conveyance of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the Closing Conditions, which include the following:

(a) All RUS Regulatory Approvals and all CDC Required Regulatory Approvals and all other consents and approvals, required of the RUS and CDC, respectively, to consummate the transaction contemplated by the Agreement shall have been obtained and continue to be in full force and effect; and

(b) RUS shall have provided to CDC and CDC shall have provided to the RUS, in form and substance satisfactory to each party's respective counsel, a final form of each closing document as required in Article IV.

8.2 CDC's obligation to effect the transfer of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) There shall not have occurred and be continuing a Material Adverse Effect;

(b) The RUS shall have performed and complied with in all material respects its covenants and agreements contained in this Agreement; and

(c) There shall be no Encumbrances on the Purchased Assets by virtue of a lien, indenture, judgment or other cloud on the title, except as provided in Article II.

8.3 RUS's obligation to effect the transfer of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) The CDC shall have performed and complied with in all material respects its covenants and agreements contained in this Agreement;

(b) The representations and warranties of the CDC set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;



LAB

N

## ARTICLE IX TERMINATION

This Agreement may be terminated at any time prior to the Closing Date by mutual written consent of the RUS and the CDC.

## ARTICLE X MISCELLANEOUS PROVISIONS

10.1. Amendment and Modification. Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of the RUS and the CDC.

10.2. Waiver and Consents. Except as otherwise provided in this Agreement, any failure of any of the Parties to comply with any obligation, covenant, agreement or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

10.3 No Third-Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective successors and permitted assigns and are not intended to confer third-party beneficiary rights upon any other person.

10.4 CDC Assumption of RUS Settlement Agreement Rights. CDC may, prior to Closing, pay RUS the Purchase Price and RUS will deliver to CDC (a) a legal release, in the form of Exhibit A attached hereto, of its claims and interest in the Purchased Assets, (b) an assignment, in the form of Exhibit B attached hereto, of all of its interest and rights set forth in the Settlement Agreement, and (c) a copy of its written notice to the Trustee and the Bankruptcy Court of the RUS assignment to CDC. Upon CDC's exercise of the option described in this section, all rights and obligations of RUS under the Settlement Agreement, the Agreement, and the Contract shall terminate, and RUS is released from any obligations and claims under the Settlement Agreement, the Agreement and the Contract. If the CDC exercises the option set forth herein above, if the Purchase Price has been paid by CDC to RUS, and if RUS has delivered the documents required in this section 10.4, then CDC and RUS have each discharged all of their respective responsibilities and obligations to one another, and this Agreement, and the Contract, between CDC and RUS will automatically become null and void without further action by either RUS or CDC. If the option described in this section is consummated on or prior to March 15, 2000, then the Purchase Price, described in Article III, will be amended to $1,300,000.

10.5 Availability of Funding. RUS obligations under this Agreement are contingent upon the availability of funding.

10.6 Notices. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or mailed by overnight courier or registered or certified mail (return receipt requested), postage prepaid, to the Parties at the following addresses (or at



LAB
N

such other address for a Party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

(a) If to the RUS, to:

Rural Utilities Service
14th and Independence S.W.
Room 4031-S-----Stop 1516
Washington, DC 20250
Facsimile: (202) 720-1719
Attention: Larry A. Belluzzo, Program Advisor

(b) If to the CDC, to:

Contech Development Company, L.L.C.
10402 Artemel Lane, Suite 203
Great Falls, VA 22066
Facsimile: (703) 757-5905
Attention: Robert L. Carey, Jr.

With a copy to:

McGuire Woods Battle & Boothe
Washington Square
1050 Connecticut Avenue, 12th Floor
Washington, DC 20006-4007
Facsimile: 202-828-8980
Attention: Clive G.R. O'Grady

(d) If to the Transferor, to:

Glinka & Schwidde
P. O. Box 7
Cabot, Vermont 05647-0007
Attention: Gleb Glinka

10.7 Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party hereto, including by operation of law, without the prior written consent of the other Parties, nor is this Agreement intended to confer upon any other Person except the Parties hereto any rights or remedies hereunder.

RUS recognizes that CDC will assign its rights, interests and obligations under this Agreement to a project company called North Hartland, LLC. In the event of such an assignment by CDC, no prior written consent of RUS is required.



LAB
N

10.8 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the United States, as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies; provided, however, that the laws of the District of Columbia shall apply under applicable federal principles of conflicts of law.

10.9 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.10 Interpretation. Articles and headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

10.11 Exhibits. All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

10.12 Entire Agreement. This Agreement including the Exhibits, referred to herein embody the entire agreement and understanding of the Parties. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth in this Agreement. This Agreement supersedes all prior contracts, agreements and understandings between the Parties with respect to such transactions.

**IN WITNESS WHEREOF**, the RUS, VEG&T, by and through the Trustee, and the CDC have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

**RURAL UTILITIES SERVICE:**

By: [signature]
Name: LARRY A. BELLUZZO
Title: PROGRAM ADVISOR

**CONTECH DEVELOPMENT COMPANY, L.L.C.:**

By: [signature]
Name: Robert L. Carey, Jr.
Title: Managing Member

**TRUSTEE & TRANSFEROR:**

______________________________
Vermont Electric Generation & Transmission Cooperative, Inc., by and through Gleb Glinka, the Chapter 7 Trustee of the bankruptcy estate of VEG&T.

LAB

10.8 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the United States, as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies; provided, however, that the laws of the District of Columbia shall apply under applicable federal principles of conflicts of law.

10.9 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.10 Interpretation. Articles and headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

10.11 Exhibits. All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

10.12 Entire Agreement. This Agreement including the Exhibits, referred to herein embody the entire agreement and understanding of the Parties. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth in this Agreement. This Agreement supersedes all prior contracts, agreements and understandings between the Parties with respect to such transactions.

IN WITNESS WHEREOF, the RUS, VEG&T, by and through the Trustee, and the CDC have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

**RURAL UTILITIES SERVICE:**

By: [signature]
Name: Larry A. Belluzzo
Title: Program Advisor

**CONTECH DEVELOPMENT COMPANY, L.L.C.:**

By: [signature]
Name: Robert L. Carey, Jr.
Title: Managing Member

**TRUSTEE & TRANSFEROR:**

[signature], TRUSTEE

Vermont Electric Generation & Transmission Cooperative, Inc., by and through Gleb Glinka, the Chapter 7 Trustee of the bankruptcy estate of VEG&T.

LAB

10.8 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the United States, as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies; provided, however, that the laws of the District of Columbia shall apply under applicable federal principles of conflicts of law.

10.9 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.10 Interpretation. Articles and headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

10.11 Exhibits. All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

10.12 Entire Agreement. This Agreement including the Exhibits, referred to herein embody the entire agreement and understanding of the Parties. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth in this Agreement. This Agreement supersedes all prior contracts, agreements and understandings between the Parties with respect to such transactions.

IN WITNESS WHEREOF, the RUS, VEG&T, by and through the Trustee, and the CDC have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

**RURAL UTILITIES SERVICE:**

By: [signature]
Name: Larry A. Belluzzo
Title: Program Advisor

**CONTECH DEVELOPMENT COMPANY, L.L.C.:**

By: [signature]
Name: Robert L. Carey, Jr.
Title: Managing Member

**TRUSTEE & TRANSFEROR:**

[signature], TRUSTEE

Vermont Electric Generation & Transmission Cooperative, Inc., by and through Gleb Glinka, the Chapter 7 Trustee of the bankruptcy estate of VEG&T.

[redacted]

10.9. Interpretation. Articles and headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

10.10. Exhibits. All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

10.11. Entire Agreement. This Agreement including the Exhibits, referred to herein embody the entire agreement and understanding of the Parties. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth in this Agreement. This Agreement supersedes all prior contracts, agreements and understandings between the Parties with respect to such transactions.

**IN WITNESS WHEREOF**, the RUS, VEG&T, by and through the Trustee, and the CDC have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

**RURAL UTILITIES SERVICE:**

10/18/99

By: [signature]
Name: LARRY A. BELLUZZO
Title: PROGRAM ADVISOR

**CONTECH DEVELOPMENT COMPANY, L.L.C.:**

By: [signature]
Name: Robert L. Carey, Jr.
Title: Managing Member

**TRUSTEE & TRANSFEROR:**

_______________________________
Vermont Electric Generation & Transmission Cooperative, Inc., by and through Gleb Glinka, the Chapter 7 Trustee of the bankruptcy estate of VEG&T.

[redacted]

ATTCHMENT A

# RELEASE AND SATISFACTION OF LIENS

RELEASE AND SATISFACTION OF LIENS, dated as of the ________ day of _______, ______, made by the UNITED STATES OF AMERICA (the "Government"), acting through the Administrator of the Rural Utilities Service, to Contech Development Company, L.L.C. (the "Company").

WHEREAS, the Government has agreed to cause the transfer of the interest of Vermont Electric Generation & Transmission Cooperative, Inc. ("VEG&T") in the realty, personal property, improvements, fixtures, licenses contracts, connected with the hydroelectric generating facility at or near the North Hartland Lake, Vermont (the "Purchased Assets");

WHEREAS, the Company has requested that the Government release and discharge any and all rights, title, liens and interests of the Government in the Purchased Assets.

THESE PRESENTS WITNESSETH that, in consideration of the sum of one dollar in hand paid by the Company to the Government at the time of delivery of these presents and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Government does RELEASE AND DISCHARGE any and all rights, title, liens and interests of the Government in the Purchased Assets resulting from loans made to VEG&T under the authority of the Rural Electrification Act of 1936, (7U.S.C. 901 et.seq.)

This Release is made by the Government and accepted by the Company without covenant or warranty, express or implied, at law or in equity, and without recourse to the Government, in any event or in any contingency.

IN WITNESS WHEREOF, the Government has caused this instrument to be duly executed in its behalf, all as of the day and year first above written.

UNITED STATES OF AMERICA

by

Rural Utilities Service

Executed by the United States of America
In the presence of:

______________________________

______________________________
Witness

ATTACHMENT B

**ASSIGNMENT**

**FOR VALUE RECEIVED**, the undersigned hereby assigns, conveys and transfers unto Contech Development Company, L.L.C., and its successors and assigns, all its right, title and interest in the Stipulated Settlement of Claims and Motion for Approval Thereof on Shortened Notice, dated June 6, 1997, by and between Gleb Glinka, Esq., Chapter 7 Trustee of Vermont Electric Generation and Transmission Cooperative, Inc., the United States, acting through the Administrator of the Rural Utilities Service, the Town of Hartland, Vermont, the National Rural Utilities Cooperative Finance Corp., CoBank, ACB, Central Vermont Public Service Corporation and Massachusetts Municipal Wholesale Electric Company. This Assignment is made without any representations or warranties by the undersigned and without recourse to the undersigned in any event of contingency.

Rural Utilities Service

USDA

United States Department of Agriculture
Rural Development

Rural Business–Cooperative Service • Rural Housing Service • Rural Utilities Service
Washington, DC 20250

September 28, 1998

Robert L. Carey
Managing Partner
Contech Development Company, L.L.C.
10402 Artemel Lane, Suite 203
Great Falls, VA 22065

Dear Mr. Carey:

We are pleased to notify Contech Development Company, L.L.C. (Contech) that the Rural Utilities Service (RUS) has accepted Contech's proposal to purchase the interest of Vermont Electric Generation & Transmission Cooperative, Inc. (VEG&T) in the North Hartland hydroelectric facility (North Hartland) in its "as-is" condition for the stated value of $2.407 million described in Contech's June 16, 1998, proposal.

RUS's Request for Proposal issued April 28, 1998, Contech's proposal of June 16, 1998, its follow-up letter of July 24, 1998, and this letter (collectively the "Documents") will serve as the Contract between Contech and the Government (hereinafter individually referred to as "Party" or collectively as "Parties") until such time as an Asset Purchase Agreement (APA) is executed. The Parties agree to negotiate all terms and conditions of the APA expeditiously and in good faith. The APA will include among other matters Contech's promissory note, a mortgage instrument, and a security agreement. These financial instruments will be executed as consideration for the conveyance caused by RUS of VEG&T's interest in North Hartland. Thereafter, the Parties will schedule an expeditious closing date which they estimate to occur on or about November 20, 1998.

The Parties agree to the following: (i) the Parties will keep each other informed of the progress and actions, (ii) Contech will use its best efforts to complete its regulatory filings, receive orders and obtain approvals from governmental agencies in an expeditious manner, keeping RUS informed of progress, and may request appropriate assistance from the RUS, and (iii) Contech will use its best efforts to complete its restoration work for the hydroelectric utility, except latent or hidden defects, in the most expeditious manner thereby enabling recommissioning of the hydroelectric plant upon receipt of the necessary permits, licenses, and governmental approvals, which is estimated to occur within six months following the closing date.

Rural Development is an Equal Opportunity Lender
Complaints of discrimination should be sent to:
Secretary of Agriculture, Washington, DC 20250

The Parties hereto recognize the time is of the essence and they agree to take all necessary actions in an expeditious manner.

Accepted and Agreed to by the Parties this 28th Day of September 1998:

For the U.S. Government:

for LARRY A. BELLUZZO
Program Advisor
Financial Services Staff
Rural Utilities Service, USDA

For the Purchaser:

ROBERT L. CAREY
Managing Member
Contech Development Company, L.L.C.