APPENDIX TO DEFENDANT'S MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

# INDEX TO APPENDIX

PAGE(S)

Assets Purchase Agreement, Dec. 16, 1999 . . . . . . . . . . 1

Agreement For The Purchase And Sale Vermont Generating, LLC Equity Interests, Jan. 19, 2005 . . . . . . . . . . . . . . . 20

# ASSETS PURCHASE AGREEMENT

This Assets Purchase Agreement ("Agreement"), dated as of December 16, 1999, by and between the United States of America, acting through the Administrator of the Rural Utilities Service ("RUS"), Contech Development Company, L.L.C. ("CDC"), a New Hampshire domestic limited liability company, and the Vermont Electric Generation & Transmission Cooperative, Inc. ("VEG&T") acting through Gleb Glinka Esq., the Chapter 7 Trustee of the VEG&T bankruptcy estate ("Transferor"), which together may be collectively referred to herein as the "Parties" or individually as the "Party".

WHEREAS, the CDC desires to purchase, and the RUS desires that the Purchased Assets (as hereinafter defined) be transferred upon the terms and conditions hereinafter set forth; and

WHEREAS, THE CDC and RUS entered into a Contract for the transfer and purchase of the Purchased Assets and said Contract required the CDC and RUS to negotiate an asset purchase agreement, expeditiously and in good faith.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements hereinafter set forth, and intending to be legally bound hereby, the Parties hereto agree as follows:

## Article 1 Definitions

As used in this Agreement, the following terms have the meanings specified in this Article 1.

1. "Business Day" shall mean any day other than Saturday, Sunday, a legal holiday or a day on which banking institutions in Montpelier, Vermont are authorized by law or other governmental action to close.

2. "CDC Required Regulatory Approvals" means those approvals and certificates required by and from federal, state, and local governmental agencies which are necessary and required for the consummation of the transaction contemplated herein, which include but are not limited to (i) the FERC order permitting the transfer of the North Hartland Project, FERC Project 2816 to CDC, and (ii) the VT PSB order granting to CDC a certificate of public good.

3. "CDC Representatives" means the CDC's accountants, counsel, environmental consultants, financial advisors and other authorized representatives.

4. "CDC" means Contech Development Company, L.L.C., the limited liability company formed in New Hampshire, which provides technical and managerial services for the development of power generation facilities.

5. "Contract" means the September 28, 1998 letter contract, executed by the RUS and CDC.

WB





PLAINTIFF'S EXHIBIT 1

6. "Closing Date" means the date thirty days, or earlier if agreed to by RUS and CDC, after the date when all Closing Conditions have been satisfied; and it is the date on which the CDC, RUS, and the Transferor will discharge their respective responsibilities as set forth in this Agreement.

7. "Closing Conditions" means all of the conditions specified in Article VIII.

8. "Effective Date" and "Effective" means the date the Parties to this Agreement have executed it.

9. "Encumbrances" means any mortgages, pledges, liens, security interests, licenses, activity and use limitations, conservation easements, easements, deed restrictions, encumbrances and charges of any kind.

10. "FERC" means the Federal Energy Regulatory Commission.

11. "Material Adverse Effect" means the direct result of an event, including events legal or regulatory in nature, occurring between the Effective Date and the Closing Date, which prevents physical operation of the Purchased Assets until the obstruction created by such event is removed.

12. "Order on Stipulated Settlement of Claims" means the June 11, 1997 order issued by Hon. Francis G. Conrad, United States Bankruptcy Judge For the District of Vermont (Case NO. 96-10335) which orders and approves the Settlement Agreement, which incorporates into the order the Settlement Agreement, and which authorizes the parties thereto to prepare and execute any and all additional documentation needed to fulfill the terms and conditions of the Settlement Agreement.

13. "VT PSB" means the Vermont Public Service Board located in Montpelier, VT.

14. "Purchased Assets" means any interest of VEG&T in the realty, personal property, improvements, fixtures, licenses contracts, connected with the hydroelectric generating facility at or near the North Hartland Lake, Vermont.

15. "RUS" means the Rural Utilities Service an agency within the U.S. Department of Agriculture

16. "RUS Regulatory Approvals" means those approvals of, declaratory orders for, and required actions by federal, state, and local governmental agencies including Transfer Proceedings, as defined in the Settlement Agreement, that RUS will obtain, for the consummation of the transaction contemplated herein, which include (i) FERC approval of and authorization for disposition by transfer of its North Hartland Project, FERC Project 2816, and transfer of the FERC license, and (ii) VT PSB approval of the disposition by transfer of the Purchased Assets, and compliance with state laws.



LAB N

17. "RUS Representative" means the Administrator of the Rural Utilities Service, U.S. Department of Agriculture, or a person legally designated the authority to act on behalf of the Administrator.

18. "Settlement Agreement" means Stipulated Settlement of Claims and Motion for Approval Thereof on Shortened Notice, dated June 6, 1997, by and between Gleb Glinka, Esq., Chapter 7 Trustee of the estate of VEG&T; the RUS; the Town Of Hartland, Vermont; the National Rural Utilities Cooperative Finance Corporation; CoBank, ACB; Central Vermont Public Service Corporation ("CVPSC"); and Massachusetts Municipal Wholesale Electric Company, and filed on that same date in the United States Bankruptcy Court, District of Vermont, in Re: Vermont Electric Generation & Transmission Cooperative, Inc., Debtor, Case No. 96-10335, a copy of which is attached hereto in Exhibit A. The CDC is not a Party to this Settlement Agreement and relies on RUS's representations concerning same.

19. "Trustee" or "Transferor" means Gleb Glinka, Esq., of Glinka & Schwidde and any successor thereto, appointed by the United States Bankruptcy Court for the District of Vermont, Rutland, VT, to be the Chapter 7 Trustee of the estate of Vermont Electric Generation and Transmission Cooperative, Inc., (Case No. 96-10335).

## ARTICLE II PURCHASE AND TRANSFER

2.1 Upon the terms and subject to the satisfaction of the Closing Conditions contained in this Agreement, at the Closing the RUS will cause the Transferor to assign, convey, transfer and deliver a title, which is free and clear of any and all Encumbrances, to the CDC, and the CDC will purchase and acquire from the Transferor, free and clear of any and all Encumbrances, all of the Transferor's right, title and interest in and to the Purchased Assets.

2.2 The CDC will prepare a motion to the United States Bankruptcy Court for the District of Vermont (Court) to request a Court order ordering the discharge of any and all Encumbrances directly or indirectly related to the Purchased Assets as of the Closing Date.

2.3 In addition to seeking the Court order referenced in Section 2.2, CDC may perform Uniform Commercial Code lien and litigation searches to ascertain the existence of any Encumbrances on the Purchased Assets that arose subsequent to the date of the Order on Stipulated Settlement of Claims and prior to the Closing Date. If CDC's search reveals the existence of any such Encumbrances, CDC will immediately notify RUS, and if CDC is unable to obtain the Court order referenced in Section 2.2, then RUS, working together with CDC, will use its best efforts to obtain, prior to the Closing Date, evidence that such Encumbrances have been discharged and/or released.



LAR
N

2.4 If neither the Court order referenced in Section 2.2 nor the evidence of discharge and/or release referenced in Section 2.3 is obtained prior to the Closing Date, then, until the earlier of (i) 360 calendar days from the Closing Date, or (ii) the issuance of the Court order referenced in Section 2.2, the RUS, working together with CDC, agrees to continue to use its best efforts to discharge any specifically identified and non-discharged Encumbrances existing as of the Closing Date. In any event, the Parties will not delay the Closing for such non-discharged Encumbrances.

## ARTICLE III PURCHASE PRICE

The Purchase Price for the Purchased Assets shall mean ONE MILLION FOUR HUNDRED THOUSAND DOLLARS ($1,400,000; the "Purchase Price") and shall be set forth in the bill of sale, as modified by the permitted adjustments set forth below. The Purchase Price will be adjusted for amounts hereinafter described that are (i) paid by the CDC on behalf of the RUS and (ii) that are hereinafter agreed on or negotiated in good faith by the RUS and the CDC. The Purchase Price is allocated as follows:

| | |
|---|---|
| Real Property & Improvements | $ none |
| Personal Property | $1,400,000.00 (Equipment) |
| Total Purchase Price | $1,400,000.00 |

CDC shall report the transactions contemplated by the Agreement for federal Income tax and all other tax purposes in a manner consistent with the allocation determined above.

Except to the extent specifically provided herein, all costs and expenses (i.e., application and filing fees, expenses related to the regulatory approval process, etc.) incurred in connection with each Party's responsibilities under this Agreement and the transaction contemplated hereby shall be borne by the Party incurring such costs and expenses. Specifically, with regard to closing and transfer expenses, each Party will pay those closing and transfer expenses that customarily would be paid by a seller/transferor or buyer/transferee, except as noted herein.

Specific obligations CDC will pay:

1. The total outstanding Hartland Transfer Payment and Hartland Future Tax, as defined in the Settlement Agreement;
2. The CVPSC utility bill; and
3. All FERC license fees.

Specific obligations RUS will pay: NONE

Dr. Yang 2 pm wed. McCar 0-17 6707 Old Dominion 3A 300

UAB

## ARTICLE IV THE CLOSING

4.1 Subject to satisfaction of the Closing Conditions, the closing of the transfer and purchase of the Purchased Assets contemplated by this Agreement ("Closing") will take place at the offices of the Town Manager, Hartland Vermont at 10:00 A.M. on such date as the Parties may agree, which date is as soon as practicable, but no later than thirty (30) Business Days following the date on which all of the Closing Conditions have been satisfied or waived; or at such other place or time as the Parties may agree.

4.2 Upon the terms and subject to the satisfaction of the Closing Conditions in consideration of the aforesaid assignment, conveyance, transfer and delivery of the Purchased Assets, the CDC will pay or cause to be paid to the RUS the Purchase Price, less any adjustments which have been permitted in this Agreement.

4.3 At the Closing, the RUS will deliver or cause to be delivered to the CDC the following items:

(a) A bill of sale
(b) RUS Regulatory Approvals
(c) A copy of the opinion of RUS's counsel, as provided by RUS's counsel to RUS, stating that the RUS Representative has the authority to execute and deliver the Agreement and any other necessary agreements to consummate this transaction, and that the Agreement and any other necessary agreements are validly executed.
(d) A release of RUS's lien on VEG&T's interest in the Purchased Assets.
(e) One or more quitclaim deeds for conveyance of the Purchased Assets, duly executed by the Trustee and acknowledged by the RUS;

4.4 At the Closing, the CDC will deliver or cause to be delivered to the RUS the following:

(a) The Purchase Price by wire transfer, adjusted as permitted herein.
(b) A satisfactory release from liability from the Town of Hartland as required by the Settlement Agreement.
(c) Evidence that the CVPSC electric utility bill has been paid.
(d) Evidence that the FERC License Fees have been paid.
(e) CDC Required Regulatory Approvals.

## ARTICLE V CDC REPRESENTATIONS AND WARRANTIES

5.1 CDC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New Hampshire.

5.2 CDC has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the CDC.



UAB
N

5.3.There are no pending legal, arbitration, or governmental actions or proceedings to which CDC is a party and to CDC's knowledge, no such actions or proceedings are threatened or contemplated.

## ARTICLE VI RUS / TRANSFEROR REPRESENTATIONS AND WARRANTIES

6.1 RUS is an agency of the United States Government, within the U.S. Department of Agriculture, duly organized and validly existing under the laws of the United States. It has all requisite authority to own, lease, sell, and to carry on its business as is now being conducted and as contemplated by this Agreement.

6.2 RUS has the authority per the terms of the Settlement Agreement to execute and deliver this Agreement and to consummate the transaction contemplated hereby.

6.3 This Agreement has been duly and validly executed and delivered by the RUS.

6.4 Except for such notices or approvals set forth herein, and other than obtaining the RUS Regulatory Approvals and the CDC Required Regulatory Approvals, neither the execution and delivery of this Agreement by the RUS nor the transfer of the Purchased Assets pursuant to this Agreement will:

(a) conflict with or result in any breach of any of the rules and regulations of the RUS,
(b) to the knowledge of RUS, require any consent, approval, authorization or permit of, or filing with or notification to any governmental or regulatory authority,
(c) violate any order, writ, injunction, decree, statute, rule or regulation applicable to the RUS,

6.5 RUS has the authority per the terms of the Settlement Agreement to instruct the Trustee to convey, transfer and assign all title to and interest in the Purchased Assets to the CDC.

6.6 To the best of RUS's knowledge, there are no current claims, actions, proceedings or investigations pending or, to the best of RUS's knowledge, threatened against or relating to the Purchased Assets before any court, governmental or regulatory authority or body acting in an adjudicative capacity, which, if adversely determined, would have a Material Adverse Effect. The White Current Adversary, as defined in the Settlement Agreement, is solely a RUS responsibility.

6.7 The Transferor has the authority per the terms of the Settlement Agreement to perform its respective obligations described herein and has taken all necessary actions, obtained all necessary approvals, and there is no pending legal action, to which it is a party, which might adversely effect its ability to perform its obligations under this Agreement.

## ARTICLE VII COVENANTS OF THE PARTIES

7.1 From the date of this Agreement to the Closing Date, the RUS may, in its sole discretion, make such maintenance and capital expenditures to the Purchased Assets, as the RUS deems



WAB

necessary.

7.2 Prior to the Closing Date, without the prior written consent of the CDC, the RUS will not with respect to the Purchased Assets:

(i) Cause the Trustee to sell, lease (as lessor), transfer or otherwise dispose of, any of the Purchased Assets, other than assets used, and not pledge, or impose or suffer to be imposed any Encumbrance on, any of the Purchased Assets;

(ii) Cause the Trustee to enter into or amend any real or personal property tax agreement, treaty or settlement affecting or relating to the Purchased Assets;

7.3 Between the date of this Agreement and the Closing Date, the RUS will, during ordinary business hours and upon reasonable notice to RUS, and to the extent permitted under applicable law, (i) give the CDC and the CDC Representatives reasonable access to all books, records, and plans, stored in the RUS office in Washington (ii) furnish the CDC with such financial and operating data and other information in the RUS's possession with respect to the Purchased Assets as the CDC may from time to time reasonably request and as may be required to be furnished by RUS to CDC according to FERC regulations for hydroelectric facilities; and (iii) furnish the CDC a copy of each material report, schedule or other document filed or received by them with respect to the Purchased Assets with the Securities Exchange Commission, VT PSB or FERC.

7.4 RUS anticipates that CDC will request access to the facility to perform inspections, cleanup of the facility and routine maintenance of the equipment. Between the Effective Date and the Closing Date, the RUS will, during ordinary business hours, upon reasonable notice by CDC to RUS, and with RUS's written permission, allow CDC and CDC Representatives to enter on to the North Hartland hydroelectric facility (FERC Project No. 2816) to perform inspections, cleanup, and routine maintenance of the facility. RUS will not unreasonably withhold CDC access to the facility. Prior to performing such inspections, cleanup or routine maintenance, CDC will inform RUS, in writing, of the scope of work to be performed at the facility, and provide or cause to be provided to RUS an insurance certificate, in form and substance satisfactory to RUS, that provides for the appropriate levels of liability and damage coverage. Performance of such inspections, cleanup and routine equipment maintenance shall be at the risk and expense of CDC.

7.5 From time to time after the date hereof, without further consideration, the RUS will consider any request from CDC to execute and deliver such documents to the CDC as the CDC may reasonably request in order to more effectively vest in the CDC the Transferor's right, title and interest in and to the Purchased Assets.

From time to time after the date hereof, the CDC will consider any request from RUS to execute and deliver such documents to the RUS as the RUS may reasonably request in order to more effectively consummate the transfer of the Purchased Assets pursuant to this Agreement.

LKB

7.6 The Parties shall consult with each other prior to issuing any public announcement, statement or other disclosure with respect to this Agreement or the transaction contemplated hereby and shall not issue any such public announcement, statement or other disclosure prior to such consultation, except as may be required by law.

7.7 The Parties shall consult with each other as to the appropriate time of filing notifications and shall use their best efforts to make such filings at the agreed upon times, to respond promptly to any requests for additional information made by agencies, and to cause the applicable waiting periods to terminate or expire at the earliest reasonable date after each date of filing. The Parties agree that they will keep each other informed of the progress and actions related to complying with and completing all actions and requirements provided in this Agreement.

7.8 The RUS, CDC and Transferor agree to jointly forward an Application for Approval of Transfer of License, Project 2816-001, to the FERC, expeditiously upon execution of this Agreement.

7.9 RUS/Trustee shall forward a petition to the VT PSB for approval of the disposition by transfer of the Purchased Assets and compliance with state laws, expeditiously upon execution of this Agreement.

7.10 CDC shall forward a petition to the VT PSB requesting that the VT PSB grant to CDC a certificate of public good, expeditiously upon execution of this Agreement.

7.11 If before the Closing Date all or any material portion of the Purchased Assets are damaged or destroyed by fire or other casualty, the RUS shall immediately notify the CDC in writing of such fact. If such damage or destruction would have a Material Adverse Effect and the RUS has not notified the CDC of its intention to cure such damage or destruction within fifteen (15) days after its occurrence, the CDC and the RUS shall negotiate in good faith to settle the loss resulting from such casualty (including, without limitation, by making a fair and equitable adjustment to the Purchase Price) and, upon such settlement, consummate the transaction contemplated by this Agreement pursuant to the terms of this Agreement. If no such settlement is reached within sixty (60) days after the RUS's having notified the CDC of such casualty, then the CDC may terminate this Agreement.



LAB

N

## ARTICLE VIII CLOSING CONDITIONS

8.1 The respective obligations of each party to effect the transfer, and conveyance of the Purchased Assets shall be subject to the fulfillment at or prior to the Closing Date of the Closing Conditions, which include the following:

(a) All RUS Regulatory Approvals and all CDC Required Regulatory Approvals and all other consents and approvals, required of the RUS and CDC, respectively, to consummate the transaction contemplated by the Agreement shall have been obtained and continue to be in full force and effect; and

(b) RUS shall have provided to CDC and CDC shall have provided to the RUS, in form and substance satisfactory to each party's respective counsel, a final form of each closing document as required in Article IV.

8.2 CDC's obligation to effect the transfer of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) There shall not have occurred and be continuing a Material Adverse Effect;

(b) The RUS shall have performed and complied with in all material respects its covenants and agreements contained in this Agreement; and

(c) There shall be no Encumbrances on the Purchased Assets by virtue of a lien, indenture, judgment or other cloud on the title, except as provided in Article II.

8.3 RUS's obligation to effect the transfer of the Purchased Assets contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing Date of the following additional conditions:

(a) The CDC shall have performed and complied with in all material respects its covenants and agreements contained in this Agreement;

(b) The representations and warranties of the CDC set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of the Closing Date;



LAB

## ARTICLE IX TERMINATION

This Agreement may be terminated at any time prior to the Closing Date by mutual written consent of the RUS and the CDC.

## ARTICLE X MISCELLANEOUS PROVISIONS

10.1. Amendment and Modification. Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of the RUS and the CDC.

10.2. Waiver and Consents. Except as otherwise provided in this Agreement, any failure of any of the Parties to comply with any obligation, covenant, agreement or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

10.3 No Third-Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective successors and permitted assigns and are not intended to confer third-party beneficiary rights upon any other person.

10.4 CDC Assumption of RUS Settlement Agreement Rights. CDC may, prior to Closing, pay RUS the Purchase Price and RUS will deliver to CDC (a) a legal release, in the form of Exhibit A attached hereto, of its claims and interest in the Purchased Assets, (b) an assignment, in the form of Exhibit B attached hereto, of all of its interest and rights set forth in the Settlement Agreement, and (c) a copy of its written notice to the Trustee and the Bankruptcy Court of the RUS assignment to CDC. Upon CDC's exercise of the option described in this section, all rights and obligations of RUS under the Settlement Agreement, the Agreement, and the Contract shall terminate, and RUS is released from any obligations and claims under the Settlement Agreement, the Agreement and the Contract. If the CDC exercises the option set forth herein above, if the Purchase Price has been paid by CDC to RUS, and if RUS has delivered the documents required in this section 10.4, then CDC and RUS have each discharged all of their respective responsibilities and obligations to one another, and this Agreement, and the Contract, between CDC and RUS will automatically become null and void without further action by either RUS or CDC. If the option described in this section is consummated on or prior to March 15, 2000, then the Purchase Price, described in Article III, will be amended to $1,300,000.

10.5 Availability of Funding. RUS obligations under this Agreement are contingent upon the availability of funding.

10.6 Notices. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or mailed by overnight courier or registered or certified mail (return receipt requested), postage prepaid, to the Parties at the following addresses (or at



LAB

such other address for a Party as shall be specified by like notice; provided that notices of a change of address shall be effective only upon receipt thereof):

(a) If to the RUS, to:

Rural Utilities Service
14th and Independence S.W.
Room 4031-S-----Stop 1516
Washington, DC 20250
Facsimile: (202) 720-1719
Attention: Larry A. Belluzzo, Program Advisor

(b) if to the CDC, to:

Contech Development Company, L.L.C.
10402 Artemel Lane, Suite 203
Great Falls, VA 22066
Facsimile: (703) 757-5905
Attention: Robert L. Carey, Jr.

With a copy to:

McGuire Woods Battle & Boothe
Washington Square
1050 Connecticut Avenue, 12th Floor
Washington, DC 20006-4007
Facsimile: 202-828-8980
Attention: Clive G.R. O'Grady

(d) If to the Transferor, to:

Glinka & Schwidde
P. O. Box 7
Cabot, Vermont 05647-0007
Attention: Gleb Glinka

10.7 Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party hereto, including by operation of law, without the prior written consent of the other Parties, nor is this Agreement intended to confer upon any other Person except the Parties hereto any rights or remedies hereunder.

RUS recognizes that CDC will assign its rights, interests and obligations under this Agreement to a project company called North Hartland, LLC. In the event of such an assignment by CDC, no prior written consent of RUS is required.



LAB

10.8 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the United States, as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies; provided, however, that the laws of the District of Columbia shall apply under applicable federal principles of conflicts of law.

10.9 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.10 Interpretation. Articles and headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

10.11 Exhibits. All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

10.12 Entire Agreement. This Agreement including the Exhibits, referred to herein embody the entire agreement and understanding of the Parties. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth in this Agreement. This Agreement supersedes all prior contracts, agreements and understandings between the Parties with respect to such transactions.

**IN WITNESS WHEREOF**, the RUS, VEG&T, by and through the Trustee, and the CDC have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

**RURAL UTILITIES SERVICE:**

By: [signature]
Name: LARRY A. BELLUZZO
Title: PROGRAM ADVISOR

**CONTECH DEVELOPMENT COMPANY, L.L.C.:**

By: [signature]
Name: Robert L. Carey, Jr.
Title: Managing Member

**TRUSTEE & TRANSFEROR:**

______________________________
Vermont Electric Generation & Transmission Cooperative, Inc., by and through Gleb Glinka, the Chapter 7 Trustee of the bankruptcy estate of VEG&T.

10.8 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the United States, as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies; provided, however, that the laws of the District of Columbia shall apply under applicable federal principles of conflicts of law.

10.9 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.10 Interpretation. Articles and headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

10.11 Exhibits. All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

10.12 Entire Agreement. This Agreement including the Exhibits, referred to herein embody the entire agreement and understanding of the Parties. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth in this Agreement. This Agreement supersedes all prior contracts, agreements and understandings between the Parties with respect to such transactions.

**IN WITNESS WHEREOF**, the RUS, VEG&T, by and through the Trustee, and the CDC have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

**RURAL UTILITIES SERVICE:**

By: [signature]
Name: Larry A. Belluzzo
Title: Program Advisor

**CONTECH DEVELOPMENT COMPANY, L.L.C.:**

By: [signature]
Name: Robert L. Carey, Jr.
Title: Managing Member

**TRUSTEE & TRANSFEROR:**

[signature], TRUSTEE

Vermont Electric Generation & Transmission Cooperative, Inc., by and through Gleb Glinka, the Chapter 7 Trustee of the bankruptcy estate of VEG&T.

10.8 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the United States, as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies; provided, however, that the laws of the District of Columbia shall apply under applicable federal principles of conflicts of law.

10.9 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.10 Interpretation. Articles and headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

10.11 Exhibits. All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

10.12 Entire Agreement. This Agreement including the Exhibits, referred to herein embody the entire agreement and understanding of the Parties. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth in this Agreement. This Agreement supersedes all prior contracts, agreements and understandings between the Parties with respect to such transactions.

**IN WITNESS WHEREOF**, the RUS, VEG&T, by and through the Trustee, and the CDC have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

**RURAL UTILITIES SERVICE:**

By: [signature]
Name: Larry A. Bellazzo
Title: PROGRAM ADVISOR

**CONTECH DEVELOPMENT COMPANY, L.L.C.:**

By: [signature]
Name: Robert L. Carey, Jr.
Title: Managing Member

**TRUSTEE & TRANSFEROR:**

[signature], TRUSTEE

Vermont Electric Generation & Transmission Cooperative, Inc., by and through Gleb Glinka, the Chapter 7 Trustee of the bankruptcy estate of VEG&T.

[redacted]

10.9. Interpretation. Articles and headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the Parties and shall not in any way affect the meaning or interpretation of this Agreement.

10.10. Exhibits. All Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

10.11. Entire Agreement. This Agreement including the Exhibits, referred to herein embody the entire agreement and understanding of the Parties. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth in this Agreement. This Agreement supersedes all prior contracts, agreements and understandings between the Parties with respect to such transactions.

**IN WITNESS WHEREOF**, the RUS, VEG&T, by and through the Trustee, and the CDC have caused this Agreement to be signed by their respective duly authorized officers as of the date first above written.

**RURAL UTILITIES SERVICE:**

10/18/99

By: [signature]
Name: LARRY A. BELLUZZO
Title: PROGRAM ADVISOR

**CONTECH DEVELOPMENT COMPANY, L.L.C.:**

By: [signature]
Name: Robert L. Carey, Jr.
Title: Managing Member

**TRUSTEE & TRANSFEROR:**

______________________________
Vermont Electric Generation & Transmission Cooperative, Inc., by and through Gleb Glinka, the Chapter 7 Trustee of the bankruptcy estate of VEG&T.

[redacted]

ATTCHMENT A

RELEASE AND SATISFACTION OF LIENS

RELEASE AND SATISFACTION OF LIENS, dated as of the ________ day of ______, _____, made by the UNITED STATES OF AMERICA (the "Government"), acting through the Administrator of the Rural Utilities Service, to Contech Development Company, L.L.C. (the "Company").

WHEREAS, the Government has agreed to cause the transfer of the interest of Vermont Electric Generation & Transmission Cooperative, Inc. ("VEG&T") in the realty, personal property, improvements, fixtures, licenses contracts, connected with the hydroelectric generating facility at or near the North Hartland Lake, Vermont (the "Purchased Assets");

WHEREAS, the Company has requested that the Government release and discharge any and all rights, title, liens and interests of the Government in the Purchased Assets.

THESE PRESENTS WITNESSETH that, in consideration of the sum of one dollar in hand paid by the Company to the Government at the time of delivery of these presents and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Government does RELEASE AND DISCHARGE any and all rights, title, liens and interests of the Government in the Purchased Assets resulting from loans made to VEG&T under the authority of the Rural Electrification Act of 1936, (7U.S.C. 901 et.seq.)

This Release is made by the Government and accepted by the Company without covenant or warranty, express or implied, at law or in equity, and without recourse to the Government, in any event or in any contingency.

IN WITNESS WHEREOF, the Government has caused this instrument to be duly executed in its behalf, all as of the day and year first above written.

UNITED STATES OF AMERICA

by

Rural Utilities Service

Executed by the United States of America
In the presence of:

_________________________

_________________________
Witness

ATTACHMENT B

**ASSIGNMENT**

**FOR VALUE RECEIVED**, the undersigned hereby assigns, conveys and transfers unto Contech Development Company, L.L.C., and its successors and assigns, all its right, title and interest in the Stipulated Settlement of Claims and Motion for Approval Thereof on Shortened Notice, dated June 6, 1997, by and between Gleb Glinka, Esq., Chapter 7 Trustee of Vermont Electric Generation and Transmission Cooperative, Inc., the United States, acting through the Administrator of the Rural Utilities Service, the Town of Hartland, Vermont, the National Rural Utilities Cooperative Finance Corp., CoBank, ACB, Central Vermont Public Service Corporation and Massachusetts Municipal Wholesale Electric Company. This Assignment is made without any representations or warranties by the undersigned and without recourse to the undersigned in any event of contingency.

Rural Utilities Service

USDA

United States Department of Agriculture
Rural Development

Rural Business-Cooperative Service • Rural Housing Service • Rural Utilities Service
Washington, DC 20250

September 28, 1998

Robert L. Carey
Managing Partner
Contech Development Company, L.L.C.
10402 Artemel Lane, Suite 203
Great Falls, VA 22065

Dear Mr. Carey:

We are pleased to notify Contech Development Company, L.L.C. (Contech) that the Rural Utilities Service (RUS) has accepted Contech's proposal to purchase the interest of Vermont Electric Generation & Transmission Cooperative, Inc. (VEG&T) in the North Hartland hydroelectric facility (North Hartland) in its "as-is" condition for the stated value of $2.407 million described in Contech's June 16, 1998, proposal.

RUS's Request for Proposal issued April 28, 1998, Contech's proposal of June 16, 1998, its follow-up letter of July 24, 1998, and this letter (collectively the "Documents") will serve as the Contract between Contech and the Government (hereinafter individually referred to as "Party" or collectively as "Parties") until such time as an Asset Purchase Agreement (APA) is executed. The Parties agree to negotiate all terms and conditions of the APA expeditiously and in good faith. The APA will include among other matters Contech's promissory note, a mortgage instrument, and a security agreement. These financial instruments will be executed as consideration for the conveyance caused by RUS of VEG&T's interest in North Hartland. Thereafter, the Parties will schedule an expeditious closing date which they estimate to occur on or about November 20, 1998.

The Parties agree to the following: (i) the Parties will keep each other informed of the progress and actions, (ii) Contech will use its best efforts to complete its regulatory filings, receive orders and obtain approvals from governmental agencies in an expeditious manner, keeping RUS informed of progress, and may request appropriate assistance from the RUS, and (iii) Contech will use its best efforts to complete its restoration work for the hydroelectric utility, except latent or hidden defects, in the most expeditious manner thereby enabling recommissioning of the hydroelectric plant upon receipt of the necessary permits, licenses, and governmental approvals, which is estimated to occur within six months following the closing date.

Rural Development is an Equal Opportunity Lender
Complaints of discrimination should be sent to:
Secretary of Agriculture, Washington, DC 20250

The Parties hereto recognize the time is of the essence and they agree to take all necessary actions in an expeditious manner.

Accepted and Agreed to by the Parties this 28th Day of September 1998:

For the U.S. Government:

LARRY A. BELLUZZO
Program Advisor
Financial Services Staff
Rural Utilities Service, USDA

For the Purchaser:

ROBERT L. CAREY
Managing Member
Contech Development Company, L.L.C.

# AGREEMENT FOR THE PURCHASE AND SALE VERMONT GENERATING, LLC EQUITY INTERESTS

This Agreement for the Purchase and Sale of Limited Liability Company Equity Interests ("Agreement") is made this 19th day of January, 2005, between North Hartland, LLC, a Virginia domestic limited liability company, 2146 Military Road, Arlington, Virginia 22207 ("Seller") and Concord Hydro Associates, LP a New Hampshire limited partnership with a principal business address, 55 Union Street, Boston, Massachusetts, 02108 ("Concord" or "Buyer").

## I. RECITALS

WHEREAS, Seller is the owner of 100% of the issued and outstanding equity interests of Vermont Generating, LLC, a New Hampshire limited liability company ("the Company"); and

WHEREAS, the Company was originally organized on October 13, 1998 under the name "Pawtucket Generating Company, L.L.C."; its name was changed to "North Hartland, LLC" on July 13, 1999; it was administratively dissolved by the New Hampshire Secretary of State on November 1, 2002; and was reinstated by the New Hampshire Secretary of State under the name "Vermont Generating, LLC" ("VGL") effective December 9, 2004; and

WHEREAS, the Company holds the right to purchase a 4-MW hydroelectric generating facility located at North Hartland, Vermont (the "North Hartland Project"), as assignee of Contech Development Company, LLC ("CDC"), under an Assets Purchase Agreement ("APA")among CDC, the Rural Utilities Service ("RUS"), and the Vermont Electric Generation & Transmission Cooperative, Inc. ("VEGT"), acting through Gleb Glinka, Esq., the Chapter 7 Trustee of the VEGT bankruptcy estate ("Glinka"), dated December 16, 1999 (the "APA"); and

WHEREAS, Seller desires to sell, and Buyer desires to purchase, all of Seller's equity interests in the Company, consisting of 100% of the Company's limited liability company interests, on the terms and conditions set forth herein.

NOW THEREFORE, for the consideration specified below, the sufficiency of which both parties acknowledge, and based on the representations and warranties set forth below, the parties hereby agree as follows:

EXHIBIT 22

## II. RESTRICTIONS AND COVENANTS

The Parties agree to certain restrictions on the actions of the Buyer after the conveyance of the Company Shares contemplated under this Agreement. The Parties further agree to certain covenants of the Buyer. Both restrictions and covenants shall survive the conveyance of the Company Shares under this Agreement, and these Restrictions and Covenants shall remain in full force and effect until the Buyer has made the Final Payment as defined in the Terms and Conditions. The APA may not amended and/or supplemented, except as to closing procedures. These Restrictions and Covenants are as follows:

a) The "Purchased Assets" are defined in the APA as FERC Project P-2816.

b) Buyer agrees to pay the full unadjusted Purchase Price of $1.4 million to RUS under either APA Article VIII or Section 10.4 or as otherwise agreed to in writing by the Seller.

c) Buyer may only transfer or assign its interest in the Company after making the Final Payment to the Seller. Notwithstanding the foregoing, Buyer may assign its interest in the Company to an affiliate.

d) If, within the 180 day Purchase Period, Buyer has not used its best efforts to acquire the Company, filed all necessary and appropriate FERC applications, motions and applicable supporting pleadings, and made the Final Payment of the Purchase Price then the Agreement automatically shall terminate and all interests shall revert to Seller at the expiration of the 180 day Purchase Period and neither party has any obligation or liability to the other.

e) The business terms in this Agreement are strictly confidential and neither Party may disclose them to any third party, other than its employees, agents and consultants, without the prior written consent of the other Party. Seller consents to the Buyer the right to disclose to the FERC, the RUS and any other regulatory agency and party to the underlying regulatory proceedings the change in management of the Company, particularly the resignation of Robert L. Carey, Jr. as Managing Member and the appointment of Richard A. Norman as the new Managing Member, effective January 17, 2005, and the new ownership of the Company by Buyer of all of the equity interest in the Company. Attached as Exhibit A is a Certificate affirming the relevant factual representations made herein to be used, if necessary, by Buyer in discussions with third parties.

f) Seller conveys to Buyer the right to take such action as it determines necessary to close the transaction under this Agreement and to make pleadings, motions and take other action it deems necessary to

reinstate the approval of the Federal Energy Regulatory Commission for the transfer of license P-2816 as well as with respect to other regulatory agencies and interested parties.

g) The Buyer shall pay the Seller a payment of $435,000 plus accrued interest, if any, according to the terms and conditions in this Agreement at the closing with the RUS and purchase of the "Purchased Assets" pursuant to the APA. The Parties agree to use their best efforts to close the transaction with RUS as expeditiously as possible, with the express intent of closing as soon as possible after the date of this Agreement. Buyer anticipates it shall require 30-60 days to obtain FERC approval or for reinstatement of the approval order dated July 17, 2000, for transfer of license for FERC Project P-2816, which Buyer shall seek with all reasonable diligence. After receipt of a new FERC Approval Order, Buyer shall expeditiously close with RUS under either Article VIII or Section 10.4 or as otherwise agreed to by the Seller. Should the RUS Closing extend beyond April 3, 2005, the outstanding balance of $435,000 due Seller shall accrue interest at a 1.5% per month compounded rate and the final payment shall include all accrued interest.

**h)** Buyer shall deposit, by January 21, 2005, $435,000 into an escrow account to be held by Nixon Peabody LLP. Such amounts shall be payable to Seller upon receipt by Nixon Peabody of: (1) a validly-issued order issued by the FERC authorizing the transfer; and (2) evidence that Buyer has acquired from RUS the Purchased Assets pursuant to the APA.

**i) The term "<u>Shares</u>"** shall mean all equity interests of VGL.

**j) The "<u>Purchase Period</u>"** is a period that ends on the earlier of (a) 180 days from January 3rd 2005 or (b) the date that either: (1) the RUS declares the Asset Purchase Agreement to be terminated; or (2) the date of any decision by a court or final arbiter in which the challenge to the RUS's termination of the APA is decided. In the event the Buyer is unable to make the Final Payment during the Purchase Period then the interest in the Company shall automatically revert to the Seller as provided in section 11 of this Agreement without further action by either Party.

**k) "<u>Seller</u>"** is North Hartland, LLC of Virginia which is a domestic limited liability company formed in the Commonwealth of Virginia on October 6, 2004 to hold all of the equity interest in and to the Vermont Generating, LLC. Seller and CDC as assignor under the APA, including the managing member of both of these limited liability companies, represent and warrant that Seller holds all equity interests in the Company.

l) The transaction contemplated by this Agreement is a purchase by Buyer and a sale by Seller of all equity interests in the Company, which Seller shall convey to the Buyer free and clear of any claims and/or encumbrances on VGL, and free and clear of any claims or encumbrances of affiliated entities.

m) Buyer agrees to perform all obligations of VGL under the APA as originally written without modification or supplement.

n) During the Purchase Period, Seller's Managing Member agrees that Seller will not: (1) make any public statements, (2) contact any party to the proceedings, including the RUS, the Vermont Public Service Board, Central Vermont, the Town of Hartland and FERC, and (3) make any filings with any regulatory authority. Buyer agrees that it will provide copies of all regulatory filings to Seller's counsel for informational purposes.

## III. TERMS AND CONDITIONS

1. Purchase of Membership Interests of VGL

Subject to Section III, Section 11 of this Agreement, Seller shall sell and deliver to Buyer, and Buyer shall purchase and take title to and delivery of, all equity units of the Company's limited liability company interests owned by Seller (the "Shares"), representing 100% of the authorized, issued, and outstanding equity interests in the Company, on the terms and conditions set forth herein. Buyer may not transfer, assign, or sell any Share or Shares conveyed hereunder by the Seller until the Buyer makes the Final Payment, except to affiliates of Buyer.

2. Purchase Price

The total Purchase Price for the Shares shall be $465,000 (Four Hundred Sixty Five Thousand Dollars) plus Allowable Interest as may be applicable, payable to Seller by Buyer in three installments as follows:

(a) $5,000 good faith deposit, receipt of which is hereby acknowledged by Seller, paid by Buyer in wired funds on January 5, 2005 in connection with the signing of a 90 Day Exclusivity Agreement between Buyer and Seller;

(b) $25,000 Payment for Shares, payable by bank wired funds at the signing of this Agreement, for the purchase of the Shares under Section 3 below; and

(c) $435,000 payment due at closing on the "Purchased Assets" under the APA payable pursuant to the Escrow Agreement executed pursuant to this Agreement on the date the Buyer acquires from RUS any interest in the Purchased Assets (i.e., Project P-2816) by Assumption of RUS Settlement Agreement Rights pursuant to APA Article VIII or Section 10.4 or otherwise as agreed to between Buyer and the RUS.

To the extent that any material and substantive claim or liability is incurred by the Company on account of matters arising prior to the date Shares are transferred hereunder [excluding any applicable regulatory requirements of the Federal Energy Regulatory Commission, the Vermont Public Service Board, United States Army Corp of Engineers, Town of Hartland, Vermont, APA obligations, Settlement Agreement obligations, Utility Bills, and any other applicable governmental body], then the Parties agree to negotiate in good faith an equitable adjustment to the Company's purchase price within 30 days of the discovery of the claim or liability. Alternatively, the Buyer shall have the right in its sole determination and discretion to terminate this Agreement by written notice to the Seller within 30 days after discovering such a liability or claim and obtain repayment of the $25,000 payment for Shares from the Seller.

**3. <u>Closing on the Shares of the Company</u>**

The Closing on the Shares shall take place on or before January 22, 2005, at such time and place as the parties may agree. At the Closing on the Shares Seller will deliver to Buyer the Shares in the form of one certificate of limited liability company interests representing 100% of the equity in the Company, free and clear of all liens and encumbrances, duly endorsed to Buyer by Seller or accompanied by duly executed assignments in a form satisfactory to Buyer; Seller represents there are no official certificates for the Company Shares and Seller shall execute an assignment of Shares reflecting the terms and conditions of this Agreement.

**<u>(a) Seller's Representations</u>**

(1) Seller represents there are no books and records for the Company,

(2) Seller represents there are no bank books and other records relating to bank accounts currently maintained in the name of the Company;

(3) Seller represents there are no title documents to any and all other property of the Company, real or personal, tangible or intangible, wherever located; and

(4) Seller certifies that all of Seller's representations and warranties made in this Agreement are true as of the execution of this Agreement and are equally true as of the Closing unless expressly noticed to Buyer.

(5) The current VGL Managing Member, Robert L. Carey, Jr., has provided a letter of resignation as Managing Member of VGL and has appointed Richard A. Norman, President of Buyer, as Company Managing Member. Other than Robert L. Carey, Jr., the only other officer of the Company is Margaret A. Carey, Secretary. She shall provide a letter of resignation that appoints Richard A. Norman as secretary prior to the Closing on the Shares of the Company.

(6) Seller shall prepare an assignment of Interest, in the form attached as Exhibit A, by which CDC and Seller shall release, discharge, and assign to Buyer all right, title or interest that either has in the Company or the APA.

**(b)_Buyer's Deliverables**

Contemporaneously with the delivery by Seller of Seller's deliverables to Buyer at Closing, Buyer shall, also at Closing, deliver to Seller:

(1) Wired finds in the amount of $25,000 to Seller's bank on the date this Agreement is signed; and

(2) A Certificate of Buyer representing and warranting that all of Buyer's representations and warranties made in this Agreement are as true as of the Closing as they are at the signing of this Agreement; and

(3) Upon satisfaction of the conditions specified in the Escrow Agreement, the final payment equal to the remainder of the Purchase Price ($435,000), in the form of a release of the funds held in Escrow for the benefit of Seller shall be made by Buyer.

(4) On or before the RUS Closing date, the Buyer shall disclose and deliver to the Seller for informational purposes copies of all closing documents and agreements directly and indirectly related to the transaction contemplated in the APA.

**(c) Name Change**

Seller acknowledges that Buyer intends to change the Company's name back to "North Hartland, LLC" promptly after the Closing on the Shares.

4. **Seller's Further Representations and Warranties**

Seller, by its Managing Member, Robert L. Carey, Jr., represents and warrants to Buyer as follows:

(a) The Company (Vermont Generating, LLC, formerly North Hartland, LLC and originally Pawtucket Generating Company, LLC) is a New Hampshire limited liability company duly organized, validly existing and in good standing under the laws of New Hampshire.

(b) The Company does not have, and never has had, a Limited Liability Company Agreement, Bylaws, or any comparable charter document governing its internal affairs.

(c) The authorized capital stock of the Company consists of one [1] unit or share of limited liability company interests, which is issued and outstanding (the "Share"). The Share has been duly issued, fully paid and non-assessable. Seller has not pledged or granted any security interest or other lien in the Share; the Share is not subject to any attachments, liens or other encumbrances; Seller will transfer the Share free and clear of any and all claims and encumbrances, and there are no restrictions of any kind against Seller's right to dispose of the Share in accordance with this Agreement.

(d) Seller has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated under it.

(e) Seller is the owner of the Company and its sole Managing Member, Robert L. Carey, Jr., has full authority to act on behalf of the Company for all purposes related to this Agreement.

(f) The only assets of the Company are intangible contract rights relating to the North Hartland Project, including Seller's interest in the APA.

(g) Except as released, discharged, and assigned in Exhibit A attached, no individual or entity related to or affiliated with Seller or the Company has any claim to or interest in the Company, or the APA.

(h) Except as released, discharged or assigned in Exhibit A attached, the Company is the sole entity holding the right to acquire the North Hartland Project, as set forth in the APA, and there are no claims, charges, or encumbrances against its interest in the APA.

(i) The APA is the entire agreement among RUS, VEGT, Glinka, and the Company with respect to the North Hartland Project.

(j) Neither Seller nor the Company has any legal power or authority to transfer any rights previously granted to the Company or any other party in any regulatory proceeding to any third party, including any certificate, permit, or authorization of any kind, and specifically including a transfer or sale of the following:

- Certificate of Public Good issued to Vermont Electric Company under 30 VSA 248, which relates to FERC License P-2816.
- Certificate of Public Good issued to the Company under 30 VSA 231 to own and operate the North Hartland Project (nontransferable).
- Certificate of Consent issued to VEGT under 30 VSA 109, authorizing sale of the North Hartland Project to North Hartland, LLC.
- Section 401 Water Quality Permit, which runs with the FERC License and is valid for the License term.
- Operating Agreement with U.S. Army Corps of Engineers, all of which run with the FERC License and valid for the License term.

(k) Seller has provided or will provide Buyer with the RUS Technical Inspection Report as referenced in section (r) below, but otherwise, Seller makes no representation concerning the Purchased Assets to be conveyed by the VEGT under the APA.

(l) Seller represents there are no Company financial statements, including a balance sheet, a statement of revenues and expenditures, and a statement of cash flows.

(m) The Company has (and will have as of the Closing) no liabilities other that those obligations set forth in the APA, the FERC License and orders related thereto, and the CPG issued by the VT Public Service Board.

(n) Because no federal, state or local tax returns have been required to have been filed, none have been. All federal, state and local taxes required to be paid by the Company have been paid. Any tax lien due to any municipal taxing authority is due and payable by the Buyer upon the taking of title to P-2816.

(o) The Company has not conducted any business, earned any revenue, or incurred any debt during any year including the 2004 tax year, and therefore represents that no federal, state or local return is required for 2004. No tax returns are currently under audit nor has the company received any notice of audit by the Internal Revenue Service or any other taxing authority.

(p) The Company has conducted no business activity in 2005 prior to the sale of the Shares and no IRS filing is required for any such period. If Buyer determines that the sale of the Shares will require the filing of a stub period 2005 return for the Company for the period prior to the sale of the Shares, Buyer will be responsible for preparing and filing any such return, but Seller will cooperate with Buyer in its preparation and will sign any such return or related document reasonably required in connection with the filing.

(q) Except as otherwise disclosed herein, neither the execution, delivery or performance of this Agreement nor the consummation of any of the transactions provided for in this Agreement or contemplated hereby (i) will violate or conflict with any charter document of the Company, (ii) will conflict with or result in any breach of or default under any provision of any contract or agreement of any kind to which Seller or the Company is bound or by which any property or asset of the Company is subject, (iii) is prohibited by or requires Seller or the Company to obtain or make any consent, authorization, approval, registration, or filings under any statute, regulation, rule, judgment, decree or order of any court governmental agency, board, bureau, body, department or authority, or any other person, (iv) will cause any acceleration of the maturity of any note, instrument or other obligation to which the Company is a party or by which the Company is bound or with respect to which the Company is an obligor or guarantor or (v) will result in the imposition of any lien, claim, restriction, equity or encumbrance of any kind whatsoever upon or give to any other person any interest or right (including the right of

termination or cancellation) in or with respect to any of the properties, assets, business, agreements or contracts of the Company.

(r) Attachment B to this Agreement is a true and complete copy of the RUS Technical Inspection reports provided by RUS Attorney Matthew J. Troy, U.S. Department of Justice, Civil Division, P. O. Box 875, Ben Franklin Station, Washington, DC 20044 by email to the Seller concerning the physical condition of the North Hartland Project works, prepared by Harza and MWH.

(s) There are no lawsuits, actions, investigations or proceedings pending or threatened before any court or agency against the Company, nor to the best of Seller's knowledge, there any facts or circumstances that could reasonably form the basis for any such action against the Company.

**5. <u>Buyer's Representations and Warranties</u>**

(a) Buyer is a New Hampshire limited partnership duly organized, validly existing and in good standing under the laws of New Hampshire.

(b) Buyer has full power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

(c) Buyer has access to or on deposit funds to pay Seller $465,000 including interest thereon as is allowed under this Agreement for Seller's interest in the Company and the APA.

(d) Buyer has access to or on deposit funds to pay the RUS $1.4 million for the Purchased Assets under either Article VIII or Section 10.4 of the APA and the Buyer understands the basis of this sale by Seller and purchase by Buyer of Seller's interest in the Company is the payment of the full purchase price to RUS of $1.4 million and closing under either Article VIII or Section 10.4 of the APA or as otherwise agreed to by the Seller.

(e) Buyer has access to or on deposit funds to pay the Town of Hartland, Vermont's Tax Lien and the electric lien of Central Vermont Public Service Company, a copy of which shall be provided to Seller.

(f) Buyer is a sophisticated buyer, experienced in the operations and maintenance of hydroelectric plants and experienced in the acquisition of hydroelectric facilities, FERC licensing and permitting of same.

(g) Buyer has inspected the North Hartland Project works and documents, and has satisfactorily completed it investigations of the site.

(h) Buyer, through its partners, is experienced and knowledgeable of FERC license terms and conditions, including the FERC License P-2816, its license transfer proceedings, its license terms and conditions. Buyer's general partner is an experienced owner of eight (8) hydroelectric plants licensed by FERC or exempted from FERC licensing requirements.

(i) Buyer is knowledgeable and experienced in matters set forth in the Assets Purchase Agreement dated December 16, 1999.

(j) Buyer is familiar with the US Bankruptcy Court Approved and Ordered Settlement Agreement incorporated by reference into the APA.

(k) Buyer is knowledgeable of the Vermont Public Service Board ("VPSB") regulations and procedures such as Rule 4.100, its certificates of public good, its certificates of consent, and including the VPSB's docket 6415, transfer approvals and consents, terms and conditions, as Buyer's general partner is an experienced owner of a Vermont generating facility.

(l) Buyer is knowledgeable of the FERC and State interconnection matters including interconnection proceedings, orders, use charges, and dockets concerning same before FERC [P-2816-oo7 et seq., EL04-510, ER04-088], direct assignment facilities, direct assignment facility charges, primary lines, amendments to the license, and the necessity to obtain the approval of the VPSB in Docket 6415 of the Company's interconnection agreement with the North Hartland Project's transmission provider -- Central Vermont Public Service Co.

6. <u>Due Diligence and Investigation</u>

During the period prior to and after the Closing, both Buyer and Seller agree to act in good faith and cooperate with each other, and use their best efforts to provide all information and documentation in their possession (and not otherwise available in the FERC or VPSB public records related to Project P-2816) to the other party, and to use their best efforts to expeditiously consummate the closing with RUS under either APA Article VIII or Section 10.4 or as otherwise agreed to by the Seller, however any closing other than either Article VIII or Section 10.4 shall not have any effect or give rise to any condition affecting this Agreement.

If requested, Seller agrees to cooperate in Buyer's efforts to arrange a meeting with the RUS to facilitate an expeditious acquisition by the Company of the North Hartland Project . Seller understands the meeting with RUS is to confirm the closing procedure under either Article VIII or Section 10.4 of the APA and the APA remains in full force and effect. Buyer shall provide prior notification to Seller of the proposed meeting with the RUS, and Seller shall not unreasonably withhold its consent to said meeting with RUS, which Seller shall attend, with counsel, if requested to do so by Buyer. Buyer's representatives at any such meetings shall be limited to Buyer's president and counsel, to the exclusion of other parties including partners and financial companies.

**7. <u>Conduct of Business Pending Closing</u>**

From the date hereof until the final $435,000 payment of the purchase price, both Parties: (i) will cause the Company to maintain itself at all times as a limited liability company duly organized, validly existing and in good standing with the State of New Hampshire; and (ii) will not permit the Company to obligate itself, sell or otherwise dispose of or pledge or otherwise encumber any of its assets. The Buyer shall retain or establish a registered agent for the Company in New Hampshire and make appropriate filings with the New Hampshire Secretary of State, Corporate Division.

**8. <u>Conditions Precedent to Buyer's Obligation to Purchase the Shares</u>**

The obligation of Buyer to purchase the Shares is subject to the fulfillment prior to or at the closing of the following conditions:

(a) There shall not be any material error, misstatement or omission in the representations and warranties made by Seller in this Agreement.

(b) All representations and warranties by Seller in this Agreement or in any written statement delivered by Seller to Buyer pursuant to this Agreement shall be true at and as of the Closing as though such representations and warranties were made at and as of said time.

(c) Seller shall have performed and complied with all the terms, provisions and conditions of this Agreement to be performed and complied with by Seller at or before closing.

**9. <u>Governing Law</u>**

This Agreement shall be governed by the laws of the State of New York.

**10. <u>Binding on Successors and Assigns</u>**

This Agreement shall be binding on and inure to the benefit of the parties and their qualified successors, assigns, personal representatives and heirs.

**11. <u>Transfer of Shares/Reversionary Interest</u>**

In the event that this Agreement terminates, the assets are not purchased from the RUS or Buyer does not make the final payment, the equity interests in the Company shall revert to Seller.

**12. <u>Termination</u>**

**(a)** Buyer may terminate this Agreement if at any time prior to making the final payment ($435,000) the Buyer discovers a material and substantive claim and/or encumbrance on the Seller's interest in the Company.

(b) Seller may terminate this Agreement if (a) if Buyer is unable or unwilling to make the Final Payment during the Purchase Period and/or (b) if the RUS unilaterally declares the Asset Purchase Agreement to be terminated and Buyer determines not to pursue any legal remedies related to RUS's actions within sixty (60) days from the date RUS makes such declaration.

(c) In the event this Agreement is terminated by either Party then the interest in the Company shall automatically revert to the Seller without further action by either Party, and neither Party shall have any liability to the other.

**13. <u>Non-Interference</u>**

The Seller (including its owners, management member, family members, related and affiliated entities) and RUS have agreed to provide each other mutual concessions and mutual releases of liability. In the

likely event RUS chooses to again require these mutual concessions from the Seller as a condition precedent to Closing under the APA, then this matter is exclusively reserved to be between the Seller and RUS, excluded from this Agreement, and all such consideration, if any, to be paid or caused to be paid by RUS is to the sole and exclusive benefit of the Seller. The Seller agrees not to pursue any claims against the RUS until after the closing under the APA.

**14. Entire Agreement and Amendments, Modifications and Supplements**

This Agreement is the entire agreement between the parties with respect to the subject matter hereof. Any amendment to this Agreement shall be made only in a writing signed by the parties hereto.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

**SELLER:** Robert L. Carey, Jr., by Johannes W. Williams

**By:** **Robert L. Carey, Jr., Managing Member**

**North Hartland, LLC – Virginia**

**BUYER:**

______________________________

**By:** **Richard A. Norman, President**

**Concord Hydro Associates, LP**

14. **Entire Agreement and Amendments, Modifications and Supplements**

This Agreement is the entire agreement between the parties with respect to the subject matter hereof. Any amendment to this Agreement shall be made only in a writing signed by the parties hereto.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**SELLER:**

______________________________

**By:** **Robert L. Carey, Jr., Managing Member**

**North Hartland, LLC – Virginia**

**BUYER:**

*Richard A. Norman*

**By:** **Richard A. Norman, President**

**Concord Hydro Associates, LP**





01/19/2005 18:57 6173673796 ESSEX POWER SERVICES PAGE 01

Exhibit A

**Seller's Certificate re Transfer of Limited Liability Company Interests**

Seller (North Hartland, LLC, a Virginia limited liability company) and its Managing Member, Robert L. Carey, Jr., hereby certify to Buyer, that:

1. The equity interests in Vermont Generating, LLC ("the Company," a New Hampshire limited liability company formerly known as North Hartland, LLC and originally formed as Pawtucket Generating Company, LLC) has this day been sold, assigned, transferred and delivered to Buyer (Concord Hydro Associates, LP, a New Hampshire limited partnership), and such equity interests represent 100% of the authorized, issued, and outstanding limited liability company equity interests of the Company.

2. Neither the Seller, nor Robert L. Carey, Jr., nor any entity, individual, or other party owned by, affiliated with, or related to either the Seller or Carey, has any remaining equity interest in the Company.

3. Henceforth, concord Concord Hydro Associates, LP shall be responsible for the business operations of the Company.

North Hartland, LLC (Virginia)

By:________________________
Robert L. Carey, Jr.
Its Managing Member

Robert L. Carey, Jr., Individually

By:________________________
Robert L. Carey, Jr.

Dated: January 21, 2005
#631569 v1 - seller's certificate

W631569.1